[No. B193173. Second Dist., Div. Seven. Oct. 16, 2007.]

JENNIFER CHIBA, Plaintiff and Appellant, v.
MARTA GREENWALD, as Personal Representative, etc., Defendant and
Respondent.

## COUNSEL

Oldman, Colley, Sallus, Gold, Birnberg & Coleman, Ronald Gold and Justin B. Gold for Plaintiff and Appellant.

Wolf, Rifkin, Shapiro & Schulman, Roy G. Rifkin and Stephen M. Levine for Defendant and Respondent.

---

## OPINION

**ZELON, J.**—The cohabitating partner of a deceased musician sued the administrator of the decedent's estate under an agreement alleging breach of oral contract, quantum meruit, declaratory relief and constructive trust. Because the agreement required performance of certain duties controlled by the Talent Agencies Act (Lab. Code,[1] § 1700 et seq.) (TAA), the matter was referred to the jurisdiction of the Labor Commissioner, who found the entire contract void for plaintiff's lack of a talent agent license. In the trial de novo, the superior court declined to sever the unlawful portion of the agreement with respect to the TAA, sustained the administrator's demurrer to the second amended complaint without leave to amend, dismissed the action, and declined to vacate dismissal. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

During the summer of 1999, plaintiff and appellant Jennifer Chiba began a romantic relationship with singer and songwriter Elliot Smith (also known as Steven Paul Smith). On August 26, 2002, Chiba moved in with Smith. The couple lived together until Smith died intestate on October 21, 2003. The probate court appointed defendant and respondent Marta Greenwald administrator of Smith's estate.

## I. *THE COMPLAINT*

On July 30, 2004, Chiba sued Greenwald for breach of oral contract, quantum meruit, declaratory relief and constructive trust.

---

[1] All further statutory references are to the Labor Code unless otherwise indicated.

The complaint alleged that Chiba and Smith entered into an oral agreement in August 2002. Chiba and Smith allegedly agreed to "live together, cohabitate and combine their efforts and earnings," "share equally any and all property accumulated as a result of their efforts whether individual or combined," and "hold themselves out to the public as husband and wife." The complaint claimed Smith promised to provide for Chiba's "financial needs and support for the rest of her life" in exchange for her domestic services as his "homemaker, housekeeper, cook, secretary, bookkeeper and financial counselor," "forego[ing] any independent career opportunities."

In a separate paragraph, the complaint also alleged that Chiba had agreed to be Smith's "manager and agent for the purposes of arranging [his] booking and scheduling [his] appearances for musical performances" and to carry out "the preparation and production of [his] album" in exchange for "15% of the proceeds earned and received."

Chiba claimed Greenwald breached the agreement by refusing to pay her for performing her contracted services. Chiba attached to her complaint a creditor's claim in excess of $1 million for the contracted services she rendered to Smith and for the proceeds from his compositions, performances and albums.

## II. *CHIBA'S DEPOSITION TESTIMONY*

In her deposition of September 29, 2004, Chiba testified that her agreement with Smith provided she would be his "manager" and "agent" responsible for "booking" and "scheduling" his "appearances for musical performances." Chiba confirmed that the agreement provided she would be "specifically entitled to 15 percent of the proceeds earned and received" on all of Smith's "performances" and "album sales." Chiba also stated that she actually procured venues and negotiated performance fees for Smith in New York and Los Angeles.

## III. *THE FIRST AMENDED COMPLAINT*

On November 1, 2004, Chiba filed her first amended complaint, in which she omitted in its entirety the paragraph detailing her role and rate of commission as Smith's manager and agent. Instead, she added the terms "manager and agent" to the list of her duties as homemaker, housekeeper, cook, secretary, bookkeeper and financial counselor.

## IV. REFERRAL TO THE LABOR COMMISSIONER

On December 3, 2004, Greenwald moved to stay the action and refer the matter to the Labor Commissioner to resolve whether the contract involved the services of a licensed talent agency with respect to the TAA. The trial court granted the motion on January 10, 2005.

On November 16, 2005, the Labor Commissioner determined that Chiba and Smith had entered into one integrated agreement that included the performance of "unlawful procurement activities 'mixed in' with activities for which a [talent agency] license was not required." According to the Labor Commissioner, the fact that "Chiba ha[d] abandoned her prior claim for commissions for her procurement activities [was] essentially irrelevant to the validity and enforceability of the alleged oral agreement between her and Smith." Because Chiba was not a licensed talent agency, the Labor Commissioner found the oral agreement was "void from its inception, in its entirety" and that Chiba had no enforceable rights.

## V. TRIAL DE NOVO

On March 27, 2006, the trial court lifted the stay, granted Chiba's request for a trial de novo from the Labor Commissioner's ruling, and consolidated the trial de novo into the existing case.

In its minute order, the court determined that Greenwald's demurrer to the first amended complaint would be treated as a motion for judgment on the pleadings. The court found Chiba had pled inconsistently the tasks she allegedly performed for Smith in the complaint and first amended complaint. It judicially estopped Chiba from pleading that "she acted as [Smith's] manager and agent for the purposes of arranging the booking and scheduling appearances for musical performances," and then "omit[ting] these allegations in a subsequent complaint to avoid the legal consequences of these acts." The court gave Chiba leave to amend to correct her inconsistent pleadings.

## VI. THE SECOND AMENDED COMPLAINT

On April 28, 2006, Chiba filed her second amended complaint, the operative complaint, which divided her agreement with Smith into two separate parts: (1) the cohabitation agreement; and (2) the recording management agreement.

The cohabitation agreement consisted solely of Chiba's promise to be Smith's homemaker, housekeeper, cook, secretary, bookkeeper and financial

counselor, forgoing any independent career opportunities. In consideration, Smith agreed to provide for all of Chiba's financial needs and support for the rest of her life.

The recording management agreement consisted solely of Chiba's promise to be Smith's manager and agent for the purposes of arranging his booking and scheduling his appearances for musical performances, and to prepare and produce his albums. In consideration, Smith agreed to give Chiba 15 percent of the proceeds.

In her second amended complaint, Chiba conceded that she had not been and was not licensed as a talent agency, and was unaware that licensure was required under the TAA. She further expressly conceded that her lack of a talent agency license rendered the recording management agreement "void and unenforceable." In addition, Chiba pled that she would not seek to enforce any of her rights under the recording management agreement. Instead, she sought to sever the recording management agreement and to pursue all her remedies only under the cohabitation agreement.

## VII. *DEMURRER TO THE SECOND AMENDED COMPLAINT*

On June 5, 2006, the trial court sustained Greenwald's demurrer to the second amended complaint without leave to amend.

The court found inconsistency in the pleadings of the complaint and its amended versions. Although the second amended complaint was found to be "artfully pleaded," the court nonetheless determined the unlawful and lawful services Chiba allegedly rendered to be "inextricably intertwined." The court held that Chiba had failed to correct the defect present in her first amended complaint and to demonstrate that the TAA should not apply to the entire contract.

The court declined to sever the unlawful from the lawful activities of the contract, "because the public policy rationale for the Talent Agencies Act must be maintained and is applicable to all causes of action in the second amended complaint." As a result, the court found the contract void and dismissed the action.

## VIII. *MOTION TO VACATE DISMISSAL*

On July 12, 2006, Chiba moved to vacate the dismissal based upon new case authority in *Marathon Entertainment, Inc. v. Blasi* holding that with respect to an unlicensed talent agency the lawful and unlawful portions of a personal management contract might be severable. (See *Marathon*

*Entertainment, Inc. v. Blasi* (June 23, 2008, B179819) review granted Sept. 20, 2006, S145428 (*Marathon*).)[2]

On August 9, 2006, the trial court declined to sever the unlawful from the lawful acts contained in the agreement, because "the activities which have been alleged would nevertheless be non-compensable because they were mixed with activities which required a license [and] because of the overriding public policy of deterring unlicensed activities." Even so, the court observed: "One of the things that did strike me about the *Marathon* case . . . it's interesting that it went into a discussion of *Marvin* [*v. Marvin* (1976) 18 Cal.3d 660 [134 Cal.Rptr. 815, 557 P.2d 106]] because we have two people that lived together and never got married." The court found the existence of a *Marvin* relationship in this case to be "a complication" because, unlike other TAA cases that involved a purely commercial relationship, Chiba was "someone who has violated the Talent Agencies Act and has done this in the context of her personal relationship with the deceased." The court ultimately found the underlying facts to be unlike *Marathon*, but rather like *Waisbren v. Peppercorn Productions, Inc.* (1995) 41 Cal.App.4th 246 [48 Cal.Rptr.2d 437] (*Waisbren*) and the line of cases that have made up the talent agency law.

Chiba timely appealed from the order dismissing the second amended complaint.

## DISCUSSION

The issue before us is whether the TAA bars compensation for all services performed under an agreement which is in part a *Marvin* agreement but in which a portion of the agreement is made void by the lack of a talent agency license.

## I. *STANDARD OF REVIEW*

On appeal from an order dismissing a complaint after the sustaining of a demurrer, we independently review the pleading to determine whether the facts alleged state a cause of action under any possible legal theory. (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 [9 Cal.Rptr.2d 92, 831 P.2d

---

[2] On September 20, 2006, the Supreme Court granted review in *Marathon*. On review, *Marathon* presents the following issues: "(1) Are the licensing requirements of the Talent Agencies Act (Lab. Code section 1700 et seq.) applicable to personal business managers as well as talent agents? (2) Is the doctrine of severability of contracts applicable to violations of the Act, or does any act of unlicensed procurement of entertainment employment for an actor by an unlicensed personal business manager in violation of the Act void a contract for personal management services in its entirety?" (<http://appellatecases.courtinfo.ca.gov/search/case/mainCaseScreen.cfm?dist=0&doc_id=433947&doc_no=S145428> [as of Oct. 16, 2007].)

317]; *Berger v. California Ins. Guarantee Assn.* (2005) 128 Cal.App.4th 989, 998 [27 Cal.Rptr.3d 583].) We give the complaint a reasonable interpretation, "treat[ing] the demurrer as admitting all material facts properly pleaded," but do not "assume the truth of contentions, deductions or conclusions of law. [Citation.]" (*Aubry, supra,* 2 Cal.4th at p. 967.) We liberally construe the pleading with a view to substantial justice between the parties. (Code Civ. Proc., § 452; *Kotlar v. Hartford Fire Ins. Co.* (2000) 83 Cal.App.4th 1116, 1120 [100 Cal.Rptr.2d 246].)

## II. *THE PLEADINGS SHOW CHIBA LACKED A TALENT AGENCY LICENSE*

The TAA provides that "[n]o person shall engage in or carry on the occupation of a talent agency without first procuring a license therefor from the Labor Commissioner." (§ 1700.5.) " 'Talent agency' means a person or corporation who engages in the occupation of procuring, offering, promising, or attempting to procure employment or engagements for an artist or artists, except that the activities of procuring, offering, or promising to procure recording contracts for an artist or artists shall not of itself subject a person or corporation to regulation and licensing under this chapter." (§ 1700.4, subd. (a).)

█ "Unlike talent agents, personal managers are not covered by the Act. Personal managers primarily advise, counsel, direct, and coordinate the development of the artist's career. They advise in both business and personal matters, frequently lend money to young artists, and serve as spokespersons for the artists. [Citation.]" (*Park v. Deftones* (1999) 71 Cal.App.4th 1465, 1469–1470 [84 Cal.Rptr.2d 616]; see *Waisbren, supra,* 41 Cal.App.4th at 252–253.) However, if a personal manager even incidentally performs the occupation of a talent agency by soliciting or procuring artistic employment or engagements for an artist, the personal manager must comply with the licensing requirement under the TAA. (*Waisbren, supra,* 41 Cal.App.4th at p. 251.) "The rationale for denying a personal manager recovery even for activities which were entirely legal is based on the public policy of the Act to deter personal managers from engaging in illegal activities. [Fn. omitted.] Knowing they will receive no help from the courts in recovering for their legal activities, managers are less likely to enter into illegal arrangements. [Fn. omitted.] In *Waisbren,* the court observed one reason the Legislature did not enact criminal penalties for violation of the Act was 'because "the most effective weapon for assuring compliance with the Act is the power . . . to declare any contract entered into between the parties void from the inception." ' [Fn. omitted.]" (*Yoo v. Robi* (2005) 126 Cal.App.4th 1089, 1104 [24 Cal.Rptr.3d 740].)

■ The Labor Commissioner has original and exclusive jurisdiction over issues arising under the TAA. (*Styne v. Stevens* (2001) 26 Cal.4th 42, 54–56 [109 Cal.Rptr.2d 14, 26 P.3d 343].) In cases of controversy arising under the TAA, "the parties involved shall refer the matters in dispute to the Labor Commissioner, who shall hear and determine the same, subject to an appeal within 10 days after determination, to the superior court where the same shall be heard de novo." (§ 1700.44, subd. (a).) " 'A hearing *de novo* literally means a new hearing, or a hearing the second time. . . . It is in no sense a review of the hearing previously held, but is a complete trial of the controversy, the same as if no previous hearing had ever been held. . . . A hearing *de novo* therefore is nothing more nor less than a trial of the controverted matter by the court in which it is held. . . .' " (*Buchwald v. Katz* (1972) 8 Cal.3d 493, 501 [105 Cal.Rptr. 368, 503 P.2d 1376]; see *Yoo v. Robi, supra*, 126 Cal.App.4th at p. 1099.)

Here, in her second amended complaint, Chiba concedes that she was not licensed as a talent agency, that her lack of a talent agency license rendered the recording management portion of the agreement void and unenforceable, and that she would not seek compensation for services rendered that required licensure. The only issue is whether she may enforce the remainder of the agreement.

### III. *THE PLEADINGS SHOW THE PARTIES HAD A* MARVIN *AGREEMENT*

■ "Adults who voluntarily live together and engage in sexual relations are competent to contract respecting their earnings and property rights. Such contracts will be enforced 'unless expressly and inseparably based upon an illicit consideration of sexual services . . . .' (*Marvin* v. *Marvin*[, *supra*, 18 Cal.3d at p. 672].)" (*Whorton v. Dillingham* (1988) 202 Cal.App.3d 447, 451 [248 Cal.Rptr. 405].) " 'If a man and woman [who are not married] live together as husband and wife under an agreement to pool their earnings and share equally in their joint accumulations, equity will protect the interests of each in such property.' " (*Marvin v. Marvin, supra*, 18 Cal.3d at pp. 667–668 (*Marvin*), quoting *Vallera v. Vallera* (1943) 21 Cal.2d 681, 685 [134 P.2d 761].)

Moreover, a "promise to perform homemaking services is, of course, a lawful and adequate consideration for a contract [citation]—otherwise those engaged in domestic employment could not sue for their wages . . . . [Citation.]" (*Marvin, supra*, 18 Cal.3d at p. 670, fn. 5.) *Marvin* expressly rejected the argument that the partner seeking to enforce the contract must have contributed either property or services additional to ordinary homemaking services. (*Ibid.*)

In this case, Chiba has adequately pled a *Marvin* agreement between Smith and herself. They allegedly agreed to "live together, cohabitate and combine their efforts and earnings," "share equally any and all property accumulated as a result of their efforts whether individual or combined," and "hold themselves out to the public as husband and wife." Further, Chiba pled that Smith promised to provide for her "financial needs and support for the rest of her life" in exchange for her domestic services as his "homemaker, housekeeper, cook, secretary, bookkeeper and financial counselor," forgoing any independent career opportunities. The promise to perform these domestic services is lawful and adequate consideration for a contract.

Having found a *Marvin* agreement has been pled, we now determine whether the agreement can be severed.

## IV. THE TRIAL COURT DID NOT ERR IN DECLINING TO SEVER THE AGREEMENT

██ "Where a contract has but a single object, and such object is unlawful, whether in whole or in part, or wholly impossible of performance, or so vaguely expressed as to be wholly unascertainable, the entire contract is void." (Civ. Code, § 1598.) However, "[w]here a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest." (Civ. Code, § 1599.) "Furthermore, although Civil Code section 1599 authorizes a court to sever the illegal object of a contract from the legal it does not require the court to do so. The decision whether to sever the illegal term of a contract is informed by equitable considerations." (*Yoo v. Robi, supra,* 126 Cal.App.4th at p. 1105.)

██ Here, the trial court found that there is only one agreement, whose lawful and unlawful objects are inextricably intertwined. Chiba did not plead separate consideration for the lawful and unlawful portions until the second amended complaint, but that pleading was not consistent with the two previous iterations of the pleadings on that critical point.

██ While the dissent sets forth a number of reasons that would support severance in this case, none of those reasons requires severance.[3] Applying equitable considerations and "the overriding public policy of deterring unlicensed activities," the court below rejected severance. It reasoned that the lawful activities alleged would "nevertheless be non-compensable because they were mixed with activities which required a license . . . ." Equity does

---

[3] This case does not present, as a result of the pleading problems, the issue of whether a *Marvin* agreement coupled with clearly independent duties unenforceable under the TAA can be enforced. That issue remains for a later day.

not demand acceptance of the most favorable set of multiple conflicting versions of the facts set forth by a party in her pleadings. The inconsistencies in the pleadings, specifically with respect to the issues relating to severability, create a record on which the conclusion that the primary purpose of the parties in entering the agreement was the personal relationship, and that the illegal terms were secondary and could be abandoned while all of the other terms of the agreement remained enforceable, is not mandated. On that record we cannot conclude that equity compelled severance in this case.

Accordingly, the court did not err in declining to sever the agreement.

## DISPOSITION

The order is affirmed. Greenwald is awarded her costs on appeal.

Woods, J., concurred.

**JOHNSON, Acting P. J.,** Dissenting.—I respectfully dissent, in order to explain why I differ from the conclusion reached in the majority opinion and also to clarify how this case appears fundamentally distinguishable from *Yoo v. Robi*,[1] a case I authored in 2005, with Justices Woods and Zelon concurring in that decision.

Respondent and the majority emphasize what the majority characterizes as "inconsistencies in the pleadings, specifically with respect to the issues relating to severability." This evidently refers to the three complaints appellant filed—the original complaint, the first amended complaint, and the second amended complaint. As the majority itself points out, the original complaint alleged the two contracts (or clauses of a single contract)—the lawful and unlawful—in separate paragraphs. The first amended complaint dropped the paragraph reciting the unlawful contract but added the "manager and agent" services to the list of duties she performed as part of the *Marvin* contract. Finally, in the second amended complaint she alleged two separate contracts—the cohabitation agreement and the management contract. But in this complaint appellant candidly conceded the second contract was unlawful and she was not entitled to recover any compensation based on that contract. Thus, it was as if the second amended complaint only alleged a single contract—the *Marvin* agreement.

In my view, the purported "inconsistencies" among these three pleadings are little more than a tempest in a teapot. This is unlike cases where

---

[1] *Yoo v. Robi* (2005) 126 Cal.App.4th 1089 [24 Cal.Rptr.3d 740].

appellants plead facts in an amended complaint which are the opposite of facts pleaded in the original complaint or omit facts from the second complaint which the trial court found had defeated their cause of action when included in the original version. Here the original and second amended complaints were essentially the same. On the issue of severability, it makes no difference whether these were two contracts or two clauses of a single contract. In none of the complaints did appellant conceal or withdraw the true nature of the arrangement she was alleging. Yes, she was in a *Marvin* relationship with the deceased artist and there was an agreement she was to be compensated for her services in that relationship, and yes, she also was performing some management and agent services for him and she was to get a percentage of his revenues for those services.

Perhaps most significantly, however, it is my view the trial court erred in sustaining the demurrer to the original complaint—even though it did so "with leave to amend"—and consequently, any "inconsistencies" introduced in the later amended pleadings are irrelevant. Merely because plaintiffs accept a trial court's offer to amend their pleadings does not mean they concede the validity of the court's ruling the original complaint was defective. As to allegations regarding the two contracts or clauses in the original complaint— the *Marvin* arrangement and the "artist manager" deal—in my view there is no problem warranting the trial court's order sustaining a demurrer with or without leave to amend those allegations. Those allegations appear in paragraphs 8 and 9 of the original complaint and read as follows:

"8. In or about August, 2002, [appellant] and ELLIOT SMITH, aka STEVEN PAUL SMITH (hereinafter 'decedent') entered into an oral covenant and agreement (hereinafter 'Subject Agreement') by and through which the parties agreed that they would live together, cohabitate and combine their efforts and earnings and would share equally any and all property accumulated as a result of their efforts whether individual or combined. [Appellant] and decedent further covenanted and agreed with each other that they would hold themselves out to the public as husband and wife and that [appellant] would render her services as a homemaker, housekeeper, and cook to the decedent, and that [appellant] further would forego any independent career opportunities to devote her full time to decedent as a homemaker, housekeeper, cook, secretary, bookkeeper, and financial counselor to the decedent, in consideration for which decedent agreed to provide for all of the [appellant's] financial needs and support for the rest of her life.

"9. [Appellant] and decedent further covenanted and agreed as part of the foregoing Subject Agreement, that [appellant] would also act as decedent's manager and agent for the purposes of arranging the booking and scheduling appearances for musical performances by decedent as well as the preparation

and production of an album of decedent's performances, in consideration for which [appellant] would be specifically entitled to 15% of the proceeds earned and received on all such performances and album sales."

At a minimum, these two paragraphs allege two independent clauses of a single contract, each with a different promised performance by appellant in return for a different form and measure of consideration. Alternatively, they may be characterized as two separate contracts executed at the same time. But, for reasons explained below, whether considered separate clauses or different contracts, they are severable and the *Marvin* arrangement is enforceable.

One of the alleged contracts or clauses qualifies as a quasi-marital partnership where appellant is to perform a variety of domestic and secretarial duties while the two hold themselves out as husband and wife. As consideration for appellant's performance of these promised duties she is to "share equally any and all property accumulated as a result of their efforts whether individual or combined" and to be provided by the deceased her "financial needs and support for the rest of her life." That contract or clause, if proven, is lawful and valid under *Marvin v. Marvin*.[2]

The other contract or clause calls for appellant to serve as the deceased's "manager and agent" and in that capacity to perform distinctly different functions and for a different measure of consideration. She is to arrange and schedule the deceased's musical performances and prepare and produce his albums and as consideration for those activities is to receive 15 percent of the proceeds earned and received from those appearances and albums.

Depending primarily on the meaning of the term "arrange," this latter contract or clause is arguably unlawful. That is because appellant never registered as a talent agent, yet the procurement of new concert dates is a function expected of an agent rather than a personal manager.[3] The remainder of the activities appellant promised to perform in this contract, on the other hand, do not require registration as a talent agent. Merely "scheduling" musical performances someone else has solicited and obtained does not appear something only registered agents are licensed to do. Moreover, the

---

[2] *Marvin v. Marvin* (1976) 18 Cal.3d 660 [134 Cal.Rptr. 815, 557 P.2d 106].

[3] "[A talent agency is] a person or corporation who engages in the occupation of procuring, offering, promising, or attempting to procure employment or engagements for an artist . . . ." (Lab. Code, § 1700.4, subd. (a).)

"No person shall engage in or carry on the occupation of a talent agency without first procuring a license therefor from the Labor Commissioner. . . ." (Lab. Code, § 1700.5.)

procurement of recording contracts is expressly exempted from the talent agent registration requirement.[4]

Nonetheless, the term "arranging" is susceptible to the interpretation it was contemplated appellant would solicit and obtain new concert dates. This is a function it would be illegal for her to perform without registering as a talent agent, something she admittedly had not bothered to do. Furthermore, in her briefing and in her deposition as well, appellant has conceded the portion of the agreement in which she agreed to "arrange" performances violated the Talent Agencies Act. The question of severability remains, however. That is, whether the contract or clause which promised appellant 15 percent of the proceeds from the deceased's concerts and record albums in return for work she did related to those concerts and albums infects the contract or clause which promised her a share in his income, however it was earned, along with lifetime support in return for her personal services in connection with their personal relationship.

The common law has long recognized contracts containing lawful clauses frequently can be severed from unlawful clauses contained in the same contract and those lawful clauses then enforced. As Williston's treatise emphasizes, "[w]here [as here] not only is the consideration separable into legal and illegal portions, but the promises are also correspondingly apportioned, that is, where the agreement may properly be called divisible, recovery may be had upon the promises which are supported by the legal portions of the consideration."[5] Furthermore, "If the legal portion of a bilateral contract is severable, legal promises on one side being wholly supported by legal promises on the other, and the illegal portion of the contract does not go to its essence, the legal part may be enforced."[6]

The Restatement likewise recognizes a contract unlawful in part is not necessarily unenforceable in its entirety, although it does not use the language of "severability" in doing so. "If the parties' performances can be apportioned into corresponding pairs of part performances so that the parts of each pair are properly regarded as agreed equivalents and one pair is not offensive to public policy, that portion of the agreement is enforceable by a party who did not engage in serious misconduct."[7]

The common law principles sanctioning the severability of contracts and thus the enforcement of lawful clauses in contracts containing unlawful

---

[4] Labor Code section 1700.4, subdivision (a) provides in part: "[T]he activities of procuring, offering, or promising to procure recording contracts for an artist or artists shall not of itself subject a person or corporation to regulation and licensing under [the Talent Agencies Act]."

[5] 8 Williston on Contracts (4th ed. 1998) section 19.70, page 548.

[6] 8 Williston on Contracts, *supra*, section 19.72, pages 553–554.

[7] Restatement Second of Contracts, section 183, page 27.

provisions have been codified in California. "Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest."[8]

The cases which have denied personal managers or other persons who failed to obtain a "talent agent" license any recovery under their contract with the artist, unlike the case before this court, failed to involve situations where "the consideration [was] separable into legal and illegal portions, [and] the promises [were] also correspondingly apportioned . . . ."[9] Instead they all involved attempts to recover as consideration a percentage of what the artist earned for the performance, album, or other artistic product the representative or other appellant claimed their contract entitled them to receive in return for promises to perform services related to that artistic endeavor. Thus, the consideration and the promised unlawful performance were closely interrelated.

In some of those cases, the personal representatives have claimed they were owed a percentage of the artist's earnings from the artist's artistic product in return for professional services they rendered related to the artist's artistic "product" other than (or in addition to) any services they may have rendered which only a registered talent agent is permitted to perform. In other words, even conceding they had procured the entertainment deal that made it possible for the artist to produce the income-generating "product," they also did other things called for in their contracts that were not unlawful and thus they deserved a percentage of the earnings for those services. These attempts to gain partial recoveries under contracts as "personal representatives" have failed, however, in several cases—among them, *Park v. Deftones,*[10] *Waisbren v. Peppercorn Productions Inc.,*[11] and *Yoo v. Robi,*[12] the latter which I authored for this court.

These opinions would apply and, if followed, deny appellant any recovery if she were still seeking to recover the 15 percent—or at least some percentage—of the deceased's album sales and proceeds from past performances under the second contract or clause. Such a claim would be based on the theory some part of the work appellant did under that contract or clause did not constitute unlawful services performed as an unlicensed talent agent, but rather lawful services which personal representatives are allowed to

---

[8] Civil Code section 1599.

[9] 8 Williston on Contracts, *supra*, section 19.70, page 548.

[10] *Park v. Deftones* (1999) 71 Cal.App.4th 1465 [84 Cal.Rptr.2d 616].

[11] *Waisbren v. Peppercorn Productions, Inc.* (1995) 41 Cal.App.4th 246 [48 Cal.Rptr.2d 437].

[12] *Yoo v. Robi, supra,* 126 Cal.App.4th 1089.

undertake. In that instance, she would be contending she should get a percent of the deceased's earnings derived from her lawful services under that second contract or clause.

This is the sort of "severance" issue the Supreme Court is considering in the *Marathon* case.[13] It also is the sort of severance this court refused to allow in *Yoo v. Robi*.[14] In the latter case, a personal manager who had knowingly failed to register as a talent agent procured concert dates for the band he was representing, a prohibited activity, but also negotiated recording contracts for that same artist. He only sought to enforce the contract as to the recording contracts and only sought his percentage fee for the revenues from the sales of those records. We rejected the manager's argument the permissible activities and the revenues generated from those activities should be severed from the impermissible activities he performed under the contract with these artists.[15] I would agree we should do the same in this case, had appellant sought to sever the portion of this contract related to albums from the portion dealing with concerts.

But this is not the specie of severance appellant is seeking in this case. Instead it represents a very different situation, a case of first impression, and quite distinguishable not only from *Yoo* but from the *Marathon* case still pending before the California Supreme Court. Unlike these other cases based on professional services (some lawful and some unlawful) directly related to the artist's "products" and to be compensated as a percentage of the earnings from those products, the *Marvin* contract or clause in this case is based on the rendering of *personal* services—homemaking, housekeeping, cooking, bookkeeping, and the like—while appellant and deceased were holding themselves out as husband and wife. It is compensated not as a percentage of revenues from concerts or albums on which appellant supplied services. Instead compensation is to be based on a pooling of the parties' accumulated property—whether derived from the deceased's artistic "products" or from either party's earnings as business executives or waitpersons at a restaurant, or any other source—along with the provision of lifetime support to appellant.[16]

---

[13] *Marathon Entertainment, Inc. v. Blasi* (June 23, 2006, B179819) review granted September 20, 2006, S145428.

[14] *Yoo v. Robi, supra,* 126 Cal.App.4th 1089.

[15] *Yoo v. Robi, supra,* 126 Cal.App.4th at pages 1104–1105.

[16] I have no occasion to express an opinion whether, in the absence of a written contract, appellant would be able to enforce her claim to "lifetime support" from the estate of her now deceased *Marvin* partner. (*In re Marriage of Thornton* (2002) 95 Cal.App.4th 251, 254–255 [115 Cal.Rptr.2d 380].)

Thus, this case presents a paradigm example of a contract which in the words of Civil Code section 1599 has two "distinct objects, of which one . . . is lawful, and one . . . is unlawful, in whole or in part . . . ."[17] Here the *Marvin* clause has a distinct object—indeed a completely distinct promised performance and promised consideration—from that in the "manager and agent" clause. Moreover, that clause and its distinct object is lawful, while only the "manager and agent" clause is unlawful—not in whole, but in part.

In the language of Williston's treatise, both the consideration and the promises in the two clauses of this contract are "separable into legal and illegal portions."[18] Consequently, "recovery may be had upon the promises which are supported by the legal portions of the consideration."[19] Likewise, applying the Restatement's test, the *Marvin* agreement and the manager and agent clause clearly "can be apportioned into corresponding pairs of part performances so that the parts of each pair are properly regarded as agreed equivalents and one pair [the *Marvin* pair of performances] is not offensive to public policy . . . ."[20] So once again, "that portion of the agreement is enforceable by a party who did not engage in serious misconduct."[21] Whatever might be said about appellant's failure to register as a talent agent, it could not be characterized as "serious misconduct," even had it been intentional rather than the result of her ignorance of these licensing requirements. Consequently, the pair of performances embodied in the *Marvin* agreement remains enforceable despite the illegality of a part of the performance appellant promised in the manager and agent clause of the contract.

To illustrate the point, imagine the first contract or clause was not a *Marvin* contract but a straight home remodeling contract. The artist promises to pay the appellant $100,000 to remodel his house. The artist dies after the house is remodeled but before he has paid the $100,000. Then assume there also is another contract or clause in the arrangements between the appellant and artist providing the appellant is to act as an agent and representative for specified types of the artist's artistic endeavors and the appellant is to receive 15 percent of the artist's earnings from those endeavors. Would we really deny the appellant the $100,000 owed for remodeling the artist's home just because he or she failed to get licensed as a talent agent?[22] I sincerely doubt this or any court would adopt such a draconian approach.

---

[17] Civil Code section 1599.

[18] 8 Williston on Contracts, *supra*, section 19.70, page 548.

[19] 8 Williston on Contracts, *supra*, section 19.70, page 548.

[20] Restatement Second of Contracts, section 183, page 27.

[21] Restatement Second of Contracts, section 183, page 27.

[22] This is not as absurd a combination of contracts as one might think in Southern California, where many aspiring actors, agents, screenwriters, and others in the entertainment business work in construction or other occupations to earn their living while attempting to gain a foothold in their chosen profession.

Or what if the appellant was not in a *Marvin* relationship but had a regular job as a housekeeper or as a secretary with the artist? But, because she was trying to work her way into the business end of the entertainment world, the housekeeper or secretary also had a contract to represent the artist in lining up "gigs" at local bars for a percentage of what he earned on these jobs. If the artist refused to pay this housekeeper or secretary the wages she had earned for her housekeeping or secretarial services, would we refuse to enforce that employment contract just because she also was arranging concerts for him at the local pub without having registered as a talent agent? Once again, I doubt we would.

In both these hypothetical situations, the two contracts or the two clauses of a single contract are severable. Perhaps the main reason is that the promise and the consideration for fulfilling that promise in each contract or clause is distinct from the promise and consideration in the other contract or clause. In the first hypothetical, the promise to remodel the artist's home and the $100,000 payment for completing that remodeling job are completely separate and distinct from the promise to procure artistic engagements for the artist and the 15 percent commission to be paid when those engagements bear fruit. Similarly, the promise to keep house or to perform secretarial work for the artist in return for a salary is separate and distinct from the promise to line up "gigs" at local bars in return for a percentage of the artist's earnings at those bars.

For the same reason, the *Marvin* contract or clause is severable from the manager and agent contract in the present case. Both the two promises and the consideration for fulfilling those promises are separate and distinct from one clause to the other. In the words of Civil Code section 1599, the two contracts or clauses have different "objects." The promise to hold themselves out as husband and wife and for appellant to forego her own career and perform the domestic duties for both of them in return for sharing in the partnership's earnings and receiving lifetime support is completely separate and distinct from the illegal promise to "arrange" concerts in return for a percentage of the earnings from those concerts.

Alternatively, it is revealing to view this *Marvin* contract or clause as more of a quasi-marital arrangement—or analogous enough that we confront the question whether a spouse of an artist would be entitled to community property or promised spousal support, if she also had a contract with her husband to act as his agent and representative in relation to his artistic business endeavors. As even respondent's counsel conceded at oral argument, the spouse would be entitled to her community property rights, presumably because those rights are independent of the illegal agent contract. For analogous reasons, the *Marvin* appellant is entitled to her benefits under that

arrangement because it too is a personal not a professionally based relationship and is independent of the illegal contract as agent and representative of the artist.

The trial court somehow found these separate and distinct contracts or contract clauses to be so "intertwined" they could not be severed. In my view, the only way these clauses conceivably could be intertwined to that degree would be if appellant had told the deceased she would not agree to the *Marvin* arrangement unless he also agreed to give her a 15 percent commission on any concerts she procured for him. There is no evidence yet in the record to even suggest to say nothing of supporting such an inference. The fact these may have been clauses included in the same oral contract the parties agreed to during the same conversation and on the same day is irrelevant. Clauses are regularly severed in order to enforce one but not the other despite the fact they are part of a single contract negotiated at the same time and place—and even when one might not have been agreed to but for the other.

The remaining argument tendered for refusing to sever these two contract clauses is that denying enforcement of the *Marvin* agreement in this case is essential to enforcement of the public policy against procurement of entertainment deals by persons who are not registered as talent agents. In my view, the "overriding public policy of deterring unlicensed activities" would not require or justify the denial of recovery in the hypothetical situations discussed above—nor in the case before this court. Conversely, if that public policy is so overwhelming in its importance as to justify denying enforcement of this *Marvin* agreement it likewise would mean recovery must be denied in the analogous situations described above.

In my view, this "overriding public policy" can be served without the overkill inherent in effectively canceling independent contractual arrangements that happen to have been agreed to by the same parties. As in the other situations described above, appellant here would take nothing from the contract clause based on her unlicensed procurement of concerts. She would not even be allowed any recovery for her permissible procurement of and related activities on the deceased's recording contracts. Instead she would only be allowed to enforce the separate and distinct, completely unrelated clause based on a personal relationship and for her personal services in connection with that relationship. No matter how the California Supreme Court resolves the *Marathon* case, in this case severance should be allowed and appellant given the opportunity to pursue enforcement of the *Marvin* agreement.

For all these reasons, if in the majority I would reverse the judgment in this case.

A petition for a rehearing was denied November 7, 2007.