[No. S145428. Jan. 28, 2008.]

MARATHON ENTERTAINMENT, INC., Plaintiff and Appellant, v. ROSA BLASI et al., Defendants and Respondents.

COUNSEL

Fox & Spillane, Gerard P. Fox, Alex M. Weingarten; Law Offices of Donald V. Smiley, Donald V. Smiley; and James Ellis Arden for Plaintiff and Appellant.

Manatt, Phelps & Phillips, Gerald A. Margolis and Benjamin G. Shatz for National Association of Artists' Managers as Amicus Curiae on behalf of Plaintiff and Appellant.

Law Offices of B. Paul Husband and B. Paul Husband for National Conference of Personal Managers, Inc., as Amicus Curiae on behalf of Plaintiff and Appellant.

Greines, Martin, Stein & Richland, Kent L. Richland, Barbara W. Ravitz and Tillman J. Breckenridge for Talent Managers Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Alschuler Grossman Stein & Kahan, Dreier Stein & Kahan, Michael J. Plonsker and Daniel A. Fiore for Defendants and Respondents.

Rintala, Smoot, Jaenicke & Rees, William T. Rintala and Michael B. Garfinkel for Association of Talent Agents as Amicus Curiae on behalf of Defendants and Respondents.

Duncan W. Crabtree-Ireland, Laura Beedy Ritchie, Danielle S. Van Lier; Reich, Adell, Crost & Cvitan, Hirsch Adell, Laurence S. Zakson; Robert S.

Giolito; Rothner, Segall & Greenstone and Anthony R. Segall for Screen Actors Guild, Inc., American Federation of Television and Radio Artists, AFL-CIO, Directors Guild of America, Inc., and Writers Guild of America, West, Inc., as Amici Curiae on behalf of Defendants and Respondents.

Anne P. Stevason for the State Labor Commissioner as Amicus Curiae.

## OPINION

**WERDEGAR, J.**—In Hollywood, talent—the actors, directors, and writers, the Jimmy Stewarts, Frank Capras, and Billy Wilders who enrich our daily cultural lives—is represented by two groups of people: agents and managers. Agents procure roles; they put artists on the screen, on the stage, behind the camera; indeed, by law, only they may do so. Managers coordinate everything else; they counsel and advise, take care of business arrangements, and chart the course of an artist's career.

This division largely exists only in theory. The reality is not nearly so neat. The line dividing the functions of agents, who must be licensed, and of managers, who need not be, is often blurred and sometimes crossed. Agents sometimes counsel and advise; managers sometimes procure work. Indeed, the occasional procurement of employment opportunities may be standard operating procedure for many managers and an understood goal when not-yet-established talents, lacking access to the few licensed agents in Hollywood, hire managers to promote their careers.[1]

We must decide what legal consequences befall a manager who steps across the line and solicits or procures employment without a talent agency license. We hold that (1) contrary to the arguments of personal manager Marathon Entertainment, Inc. (Marathon), the strictures of the Talent Agencies Act (Lab. Code, § 1700 et seq.) (Act) apply to managers as well as agents; (2) contrary to the arguments of actress Rosa Blasi (Blasi), while the Labor Commissioner has the authority to void manager-talent contracts *ab initio* for unlawful procurement, she also has discretion to apply the

---

[1] See Zelenski, *Talent Agents, Personal Managers, and Their Conflicts in the New Hollywood* (2003) 76 So.Cal. L.Rev. 979, 993–998 (hereafter *Conflicts in the New Hollywood*); Comment, *The Talent Agencies Act: Reconciling the Controversies Surrounding Lawyers, Managers, and Agents Participating in California's Entertainment Industry* (2001) 28 Pepperdine L.Rev. 381, 386 (hereafter *Talent Agencies Act*); Comment, *Regulation of Attorneys Using California's Talent Agencies Act: A Tautological Approach to Protecting Artists* (1992) 80 Cal. L.Rev. 471, 481–484 (hereafter *Regulation of Attorneys*). Additionally, in connection with the petition for review in this case, this court has received dozens of letters from personal managers working in the entertainment industry who suggest they owe a fiduciary duty to their clients to procure employment.

doctrine of severability to partially enforce these contracts; and (3) in this case, a genuine dispute of material fact exists over whether severability might apply to allow partial enforcement of the parties' contract. Accordingly, we affirm the Court of Appeal.

FACTUAL AND PROCEDURAL BACKGROUND

In 1998, Marathon and Blasi entered into an oral contract for Marathon to serve as Blasi's personal manager. Marathon was to counsel Blasi and promote her career; in exchange, Blasi was to pay Marathon 15 percent of her earnings from entertainment employment obtained during the course of the contract. During the ensuing three years, Blasi's professional appearances included a role in a film, Noriega: God's Favorite (Industry Entertainment 2000), and a lead role as Dr. Luisa Delgado on the television series *Strong Medicine*.

According to Marathon, Blasi reneged on her agreement to pay Marathon its 15 percent commission from her *Strong Medicine* employment contract. In the summer of 2001, she unilaterally reduced payments to 10 percent. Later that year, she ceased payment altogether and terminated her Marathon contract, stating that her licensed talent agent, John Kelly, who had served as her agent throughout the term of the management contract with Marathon, was going to become her new personal manager.

Marathon sued Blasi for breach of oral contract, quantum meruit, false promise, and unfair business practices, seeking to recover unpaid *Strong Medicine* commissions. Marathon alleged that it had provided Blasi with lawful personal manager services by providing the downpayment on her home, paying the salary of her business manager, providing her with professional and personal advice, and paying her travel expenses.

After obtaining a stay of the action, Blasi filed a petition with the Labor Commissioner alleging that Marathon had violated the Act by soliciting and procuring employment for Blasi without a talent agency license.[2] The Labor Commissioner agreed. The commissioner found Marathon had procured various engagements for Blasi, including a role in the television series *Strong Medicine*. Concluding that one or more acts of solicitation and procurement by Marathon violated the Act, the commissioner voided the parties' contract *ab initio* and barred Marathon from recovery.

Marathon appealed the Labor Commissioner's ruling to the superior court for a trial de novo. (See § 1700.44, subd. (a); *Buchwald v. Katz* (1972) 8

---

[2] The Labor Commissioner has original and exclusive jurisdiction over issues arising under the Act. (*Styne v. Stevens* (2001) 26 Cal.4th 42, 54–56 [109 Cal.Rptr.2d 14, 26 P.3d 343]; Lab. Code, § 1700.44, subd. (a).) All further undesignated statutory references are to the Labor Code.

Cal.3d 493, 500–501 [105 Cal.Rptr. 368, 503 P.2d 1376].) It also amended its complaint to include declaratory relief claims challenging the constitutionality of the Act. Marathon alleged that the Act's enforcement mechanisms, including the sanction of invalidating the contracts of personal managers that solicit or procure employment for artists without a talent agency license, violated the managers' rights under the due process, equal protection, and free speech guarantees of the state and federal Constitutions.

Blasi moved for summary judgment on the theory that Marathon's licensing violation had invalidated the entire personal management contract. Blasi submitted excerpts from the Labor Commissioner hearing transcript as evidence that Marathon had violated the Act by soliciting or procuring employment for her without a talent agency license. Blasi did not specifically argue or produce evidence that Marathon had illegally procured the *Strong Medicine* employment contract.

The trial court granted Blasi's motion for summary judgment and invalidated Marathon's personal management contract as an illegal contract for unlicensed talent agency services in violation of the Act, denied Marathon's motion for summary adjudication of the Act's constitutionality, and entered judgment for Blasi.

The Court of Appeal reversed in part. It agreed with the trial court that the Act applied to personal managers. However, it concluded that under the law of severability of contracts (Civ. Code, § 1599), because the parties' agreement had the lawful purpose of providing personal management services that are unregulated by the Act, and because Blasi had not established that her *Strong Medicine* employment contract was procured illegally, the possibility existed that Blasi's obligation to pay Marathon a commission on that contract could be severed from any unlawful parts of the parties' management agreement. In reaching this conclusion, the Court of Appeal distinguished prior cases that had voided management contracts in their entirety (*Yoo v. Robi* (2005) 126 Cal.App.4th 1089 [24 Cal.Rptr.3d 740]; *Waisbren v. Peppercorn Productions, Inc.* (1995) 41 Cal.App.4th 246 [48 Cal.Rptr.2d 437]) and in some cases expressly refused to sever the contracts (*Yoo*, at pp. 1104–1105).

We granted review to address the applicability of the Act to personal managers and the availability of severance under the Act.

DISCUSSION

I. *Background*

 A. *Agents and Managers*

In Hollywood, talent agents act as intermediaries between the buyers and sellers of talent. (*Regulation of Attorneys, supra*, 80 Cal. L.Rev. at p. 479.) While formally artists are agents' clients, in practice a talent agent's livelihood depends on cultivating valuable connections on both sides of the artistic labor market. (Birdthistle, *A Contested Ascendancy: Problems with Personal Managers Acting as Producers* (2000) 20 Loyola L.A. Ent. L.Rev. 493, 502–503 (hereafter *Contested Ascendancy*); *Regulation of Attorneys*, at p. 479.) Generally speaking, an agent's focus is on the deal: on negotiating numerous short-term, project-specific engagements between buyers and sellers. (*Conflicts in the New Hollywood, supra*, 76 So.Cal. L.Rev. at p. 981.)

Agents are effectively subject to regulation by the various guilds that cover most of the talent available in the industry: most notably, the Screen Actors Guild, American Federation of Television and Radio Artists, Directors Guild of America, Writers Guild of America, and American Federation of Musicians. (*Regulation of Attorneys, supra*, 80 Cal. L.Rev. at p. 487.) Artists may informally agree to use only agents who have been "franchised" by their respective guilds; in turn, as a condition of franchising, the guilds may require agents to agree to a code of conduct and restrictions on terms included in agent-talent contracts. (*Conflicts in the New Hollywood, supra*, 76 So.Cal. L.Rev. at pp. 989–990; *Contested Ascendancy, supra*, 20 Loyola L.A. Ent. L.Rev. at p. 520.) Most significantly, those restrictions typically include a cap on the commission charged (generally 10 percent), a cap on contract duration, and a bar on producing one's client's work and obtaining a producer's fee. (Screen Actors Guild, Codified Agency Regs., rule 16(g); American Federation of Television and Radio Artists, Regs. Governing Agents, rule 12-C; *Matthau v. Superior Court* (2007) 151 Cal.App.4th 593, 596–597 [60 Cal.Rptr.3d 93]; *Conflicts in the New Hollywood*, at pp. 989–990; *Contested Ascendancy*, at pp. 520–521.) These restrictions create incentives to establish a high volume clientele, offer more limited services, and focus on those lower risk artists with established track records who can more readily be marketed to talent buyers. (*Conflicts in the New Hollywood*, at p. 981; *Contested Ascendancy*, at p. 503.)

Personal managers, in contrast, are not franchised by the guilds. (*Conflicts in the New Hollywood, supra*, 76 So.Cal. L.Rev. at p. 991; *Contested Ascendancy, supra*, 20 Loyola L.A. Ent. L.Rev. at p. 522.) They typically accept a higher risk clientele and offer a much broader range of services, focusing on

advising and counseling each artist with an eye to making the artist as marketable and attractive to talent buyers as possible, as well as managing the artist's personal and professional life in a way that allows the artist to focus on creative productivity. (*Waisbren v. Peppercorn Productions, Inc., supra*, 41 Cal.App.4th at pp. 252–253; Rep. of Cal. Entertainment Com. (Dec. 2, 1985) p. 9 (hereafter Entertainment Commission Report); *Regulation of Attorneys, supra*, 80 Cal. L.Rev. at pp. 482–483.) "Personal managers primarily advise, counsel, direct, and coordinate the development of the artist's career. They advise in both business and personal matters, frequently lend money to young artists, and serve as spokespersons for the artists." (*Park v. Deftones* (1999) 71 Cal.App.4th 1465, 1469–1470 [84 Cal.Rptr.2d 616].) Given this greater degree of involvement and risk, managers typically have a smaller client base and charge higher commissions than agents (as they may, in the absence of guild price caps); managers may also produce their clients' work and thus receive compensation in that fashion. (*Conflicts in the New Hollywood*, at p. 992; *Talent Agencies Act, supra*, 28 Pepperdine L.Rev. at p. 383; *Contested Ascendancy*, at pp. 508, 526–527; *Regulation of Attorneys*, at p. 483.)

### B. *The Talent Agencies Act*

Aside from guild regulation, the representation of artists is principally governed by the Act. (§§ 1700–1700.47.) The Act's roots extend back to 1913, when the Legislature passed the Private Employment Agencies Law and imposed the first licensing requirements for employment agents. (*Buchwald v. Superior Court* (1967) 254 Cal.App.2d 347, 357 [62 Cal.Rptr. 364]; *Talent Agencies Act, supra*, 28 Pepperdine L.Rev. at p. 387; *Regulation of Attorneys, supra*, 80 Cal. L.Rev. at p. 493.) From an early time, the Legislature was concerned that those representing aspiring artists might take advantage of them, whether by concealing conflicts of interest when agents split fees with the venues where they booked their clients, or by sending clients to houses of ill repute under the guise of providing "employment opportunities." (See Stats. 1913, ch. 282, § 14, pp. 519–520 [prohibiting agents from fee splitting, sending artists to "house[s] of ill fame" or saloons, or allowing "persons of bad character" to frequent their establishments]; *Talent Agencies Act*, at pp. 386–387; *Regulation of Attorneys*, at p. 493.) Exploitation of artists by representatives has remained the Act's ˌcentral concern through subsequent incarnations to the present day. (See *Styne v. Stevens, supra*, 26 Cal.4th at p. 50.)

In 1978, the Legislature considered establishing a separate licensing scheme for personal managers. (See Assem. Bill No. 2535 (1977–1978 Reg. Sess.) as amended May 1, 1978, § 41; Assem. Com. on Labor, Employment & Consumer Affairs, Analysis of Assem. Bill No. 2535 (1977–1978 Reg. Sess.) as amended May 1, 1978, pp. 1–4; Entertainment

Com. Rep., *supra*, at p. 8.) Unable to reach agreement, the Legislature eventually abandoned separate licensing of personal managers and settled for minor changes in the statutory regime, shifting regulation of musician booking agents to the Labor Commissioner and renaming the Artists' Managers Act the Talent Agencies Act. (Stats. 1978, ch. 1382, pp. 4575–4583.)

In 1982, the Legislature provisionally amended the Act to impose a one-year statute of limitations, eliminate criminal sanctions for violations of the Act, and establish a "safe harbor" for managers to procure employment if they did so in conjunction with a licensed agent. (Former § 1700.44, as enacted by Stats. 1982, ch. 682, § 3, p. 2815; Entertainment Com. Rep., *supra*, at pp. 8, 38–39.) It subjected these changes to a sunset provision and established the 10-person California Entertainment Commission (Entertainment Commission), consisting of agents, managers, artists, and the Labor Commissioner, to evaluate the Act and "recommend to the Legislature a model bill." (Former §§ 1701–1704, added by Stats. 1982, ch. 682, § 6, p. 2816, repealed by its own terms Jan. 1, 1986.) In 1986, after receiving the Entertainment Commission Report, the Legislature adopted its recommendations, which included making the 1982 changes permanent and enacting a modest series of other changes. (Stats. 1986, ch. 488, pp. 1804–1808; Entertainment Com. Rep., at pp. 22–34; Sen. Com. on Industrial Relations, Analysis of Assem. Bill No. 3649 (1985–1986 Reg. Sess.) as amended Apr. 15, 1986, p. 5 [bill would implement Entertainment Commission's recommendations "in full"].) So the Act has stood, with minor modifications, for the last 20 years.

■ In its present incarnation, the Act requires anyone who solicits or procures artistic employment or engagements for artists[3] to obtain a talent agency license. (§§ 1700.4, 1700.5.) In turn, the Act establishes detailed requirements for how licensed talent agencies conduct their business, including a code of conduct, submission of contracts and fee schedules to the state, maintenance of a client trust account, posting of a bond, and prohibitions against discrimination, kickbacks, and certain conflicts of interest. (§§ 1700.23–1700.47.) No separate analogous licensing or regulatory scheme extends to personal managers. (*Waisbren v. Peppercorn Productions, Inc.*, *supra*, 41 Cal.App.4th at p. 252.)

---

[3] " 'Artists' means actors and actresses rendering services on the legitimate stage and in the production of motion pictures, radio artists, musical artists, musical organizations, directors of legitimate stage, motion picture and radio productions, musical directors, writers, cinematographers, composers, lyricists, arrangers, models, and other artists and persons rendering professional services in motion picture, theatrical, radio, television and other entertainment enterprises." (§ 1700.4, subd. (b).)

With this background in mind, we turn to two questions not previously addressed by this court: whether the Act in fact applies to personal managers, as the Courts of Appeal and Labor Commissioner have long assumed, and if so, how.

## II. *The Scope of the Talent Agencies Act: Application to Managers*

Marathon contends that personal managers are categorically exempt from regulation under the Act. We disagree; as we shall explain, the text of the Act and persuasive interpretations of it by the Courts of Appeal and the Labor Commissioner demonstrate otherwise.

■ We begin with the language of the Act. (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 927 [22 Cal.Rptr.3d 530, 102 P.3d 915].) Section 1700.5 provides in relevant part: "No *person* shall engage in or carry on the occupation of a *talent agency* without first procuring a license therefor from the Labor Commissioner." (Italics added.) In turn, "person" is expressly defined to include "any individual, company, society, firm, partnership, association, corporation, limited liability company, *manager*, or their agents or employees" (§ 1700, italics added), and " '[t]alent agency' means a person or corporation who engages in the occupation of procuring, offering, promising, or attempting to procure employment or engagements for an artist or artists . . ." other than recording contracts (§ 1700.4, subd. (a)).

■ The Act establishes its scope through a functional, not a titular, definition. It regulates *conduct*, not labels; it is the act of procuring (or soliciting), not the title of one's business, that qualifies one as a talent agency and subjects one to the Act's licensure and related requirements. (§ 1700.4, subd. (a).) Any person who procures employment—any individual, any corporation, any manager—is a talent agency subject to regulation. (§§ 1700, 1700.4, subd. (a).) Consequently, as the Courts of Appeal have unanimously held, a personal manager who solicits or procures employment for his artist-client is subject to and must abide by the Act. (*Park v. Deftones, supra,* 71 Cal.App.4th at pp. 1470–1471; *Waisbren v. Peppercorn Productions, Inc., supra,* 41 Cal.App.4th at p. 253; see also *Buchwald v. Superior Court, supra,* 254 Cal.App.2d at pp. 354–355 [deciding same issue under the Act's predecessor, the Artists' Managers Act].)[4] The Labor

---

[4] The Legislature clearly agreed with this understanding of the Act. In 1978, it considered but ultimately rejected a special exemption that would have specifically authorized personal managers to procure employment for artists already represented by licensed talent agencies. (See Assem. Bill No. 2535 (1977–1978 Reg. Sess.) as amended May 10, 1978 [deleting proposal to enact new § 1708, which would have codified special exemption].) In 1986, it made permanent section 1700.44, subdivision (d), which creates a safe harbor for an unlicensed person or entity to "act in conjunction with, and at the request of, a licensed talent

Commissioner, whose interpretations of the Act we may look to for guidance (see *Styne v. Stevens, supra*, 26 Cal.4th at p. 53; *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7–8 [78 Cal.Rptr.2d 1, 960 P.2d 1031]), has similarly uniformly applied the Act to personal managers. (See, e.g., *Sheridan v. Yoches, Inc.* (Cal.Lab.Com., Sept. 4, 2007) TAC No. 21-06, pp. 2, 13–20; *Jones v. La Roda Group* (Cal.Lab.Com., Dec. 30, 2005) TAC No. 35-04, pp. 9–11; *Hall v. X Management, Inc.* (Cal.Lab.Com., Apr. 24, 1992) TAC No. 19-90, pp. 28–35.)[5]

■ As to the further question whether even a single act of procurement suffices to bring a manager under the Act, we note that the Act references the "occupation" of procuring employment and serving as a talent agency. (§§ 1700.4, subd. (a), 1700.5.) Considering this in isolation, one might interpret the statute as applying only to those who regularly, and not merely occasionally, procure employment. (See *Wachs v. Curry* (1993) 13 Cal.App.4th 616, 628 [16 Cal.Rptr.2d 496] [Act applies only when "the agent's employment procurement function constitutes a significant part of the agent's business as a whole . . ."].) However, as we have previously acknowledged in dicta, "[t]he weight of authority is that even the incidental or occasional provision of such services requires licensure." (*Styne v. Stevens, supra*, 26 Cal.4th at p. 51, citing *Park v. Deftones, supra*, 71 Cal.App.4th 1465, and *Waisbren v. Peppercorn Productions, Inc., supra*, 41 Cal.App.4th 246.)[6] In agreement with these decisions, the Labor Commissioner has uniformly interpreted the Act as extending to incidental procurement. (See, e.g., *Gittelman v. Karolat* (Cal.Lab.Com., July 19, 2004) TAC No. 24-02, p. 14; *Kilcher v. Vainshtein* (Cal.Lab.Com., May 30, 2001) TAC No. 02-99, pp. 20–21; *Damon v. Emler* (Cal.Lab.Com., Jan. 12,

agency in the negotiation of an employment contract." Both the originally contemplated exemption and the ultimately adopted safe harbor provision would have been largely superfluous if unlicensed entities were already free to procure employment, so long as they did not label themselves as talent agencies. (See *Waisbren v. Peppercorn Productions, Inc., supra*, 41 Cal.App.4th at p. 259.)

[5] While we do not place great weight on legislative inaction, we note as well that the Legislature in 1982 considered but ultimately rejected an amendment to the Act that would have expressly exempted a particular class of personal managers—an amendment that would have been wholly superfluous if, as Marathon argues, they were already exempt. (Compare Assem. Bill No. 997 (1981–1982 Reg. Sess.) as amended Aug. 17, 1982 [including exemption] with Assem. Bill No. 997 (1981–1982 Reg. Sess.) as amended Aug. 26, 1982 [deleting exemption].)

[6] Post-*Styne*, the Courts of Appeal have arrived at unanimity on this question. In *Yoo v. Robi, supra*, 126 Cal.App.4th 1089, the same court that had issued *Wachs v. Curry, supra*, 13 Cal.App.4th 616, effectively repudiated its prior interpretation, noting with approval that courts have "unanimously denied . . . recovery to personal managers even when the majority of the managers' activities did not require a talent agency license and the activities which did require a license were minimal and incidental." (*Yoo*, at p. 1104, fn. omitted.)

1982) TAC No. 36-79, p. 4.) The Labor Commissioner's views are entitled to substantial weight if not clearly erroneous (*Styne v. Stevens*, at p. 53); accordingly, we likewise conclude the Act extends to individual incidents of procurement.

Marathon offers two main arguments against the conclusion that it is subject to the Act whenever it solicits or procures employment. First, it objects that the Act's title and contents reference only talent agencies and thus only talent agencies may be regulated under the Act. (See Cal. Const., art. IV, § 9; *Brunson v. City of Santa Monica* (1915) 27 Cal.App. 89, 92–93 [148 P. 950] [act whose title limits its scope to public *officer* liability may not constitutionally be interpreted to alter public *municipal corporation* liability].) Article IV, section 9 sets out this state's single-subject rule and, as relevant here, requires: "A statute shall embrace but one subject, which shall be expressed in its title. If a statute embraces a subject not in its title, only the part not expressed is void." From this, Marathon reasons that (1) the Act's title omits reference to regulation of personal managers, and (2) to the extent it purports to regulate personal managers, it is thus void.

■ This is a misreading of the constitutional provision and the 1978 legislation. The single-subject rule is intended to prevent "log-rolling by the Legislature, i.e., combining several proposals in a single bill so that legislators, by combining their votes, obtain a majority for a measure which would not have been approved if divided into separate bills." (*Harbor v. Deukmejian* (1987) 43 Cal.3d 1078, 1096 [240 Cal.Rptr. 569, 742 P.2d 1290].) In turn, "the requirement that the single subject of a bill shall be expressed in its title is to prevent misleading or inaccurate titles so that legislators and the public are afforded reasonable notice of the contents of a statute." (*Ibid.*; see also *Homan v. Gomez* (1995) 37 Cal.App.4th 597, 600 [43 Cal.Rptr.2d 647] [rule intended to prevent unrelated provisions from sliding through "unnoticed and unchallenged"]; *Planned Parenthood Affiliates v. Swoap* (1985) 173 Cal.App.3d 1187, 1196 [219 Cal.Rptr. 664] [rule intended to " 'prevent legislators and the public from being entrapped by misleading titles to bills whereby legislation relating to one subject might be obtained under the title of another' "].)

■ However, the single-subject rule "is to be liberally construed to uphold proper legislation and not used to invalidate legitimate legislation." (*San Joaquin Helicopters v. Department of Forestry* (2003) 110 Cal.App.4th 1549, 1556 [3 Cal.Rptr.3d 246]; accord, *Harbor v. Deukmejian, supra*, 43 Cal.3d at pp. 1097–1098; *Metropolitan Water Dist. v. Marquardt* (1963) 59 Cal.2d 159, 172–173 [28 Cal.Rptr. 724, 379 P.2d 28]; *Evans v. Superior Court* (1932) 215 Cal. 58, 62 [8 P.2d 467].) The Legislature may combine in a single act numerous provisions " 'governing projects so related and interdependent as to constitute a single scheme,' " and provisions auxiliary to the

scheme's execution may be adopted as part of that single package. (*Harbor*, at p. 1097, quoting *Evans*, at p. 62.) The act's title "need not contain either an index or an abstract of its provisions. The constitutional mandate [citation] is satisfied if the provisions themselves are cognate and germane to the subject matter designated by the title, and if the title intelligently refers the reader to the subject to which the act applies, and suggests the field of legislation which the text includes." (*Powers Farms v. Consolidated Irr. Dist.* (1941) 19 Cal.2d 123, 130 [119 P.2d 717]; see also *City of Whittier v. Dixon* (1944) 24 Cal.2d 664, 666 [151 P.2d 5] [to satisfy the Constitution, title need only "contain[] a reasonably intelligible reference to the subject to which the legislation is addressed"]; *Lyons v. Municipal Court* (1977) 75 Cal.App.3d 829, 841 [142 Cal.Rptr. 449].)

█ Here, the 1978 legislation and its title satisfy the California Constitution. The legislation's provisions pertain to a single subject, the comprehensive regulation of persons and entities that provide talent agency services. The title, quoted in full in the margin, identifies that subject and specifically references the existing comprehensive regulations that are to be modified.[7] The legislation defines talent agencies as those that engage in particular conduct; thus, to the extent personal managers engage in that conduct, they fit within the legislation's title and subject matter and may be regulated by its provisions.

█ Second, Marathon correctly notes that in 1978, after much deliberation, the Legislature decided not to add separate licensing and regulation of personal managers to the legislation. (See Assem. Bill No. 2535 (1977–1978 Reg. Sess.) as amended May 10, 1978, pp. 16–18 [deleting new licensure provisions].) The consequence of this conscious omission is not, as Marathon contends, that personal managers are therefore exempt from regulation. Rather, they remain exempt from regulation insofar as they do those things that personal managers do, but they are regulated under the Act to the extent they stray into doing the things that make one a talent agency under the Act.[8]

---

[7] The title of the legislation is: "An act to amend Section 9914 of, to repeal Section 9902.8 of, and to repeal Chapter 21.5 (commencing with Section 9999) of Division 3 of, the Business and Professions Code, and to amend the heading of Chapter 4 (commencing with Section 1700) of Part 6 of Division 2 of, to amend Sections 1700.2, 1700.3, 1700.4, 1700.5, 1700.6, 1700.7, 1700.9, 1700.11, 1700.12, 1700.13, 1700.15, 1700.16, 1700.17, 1700.19, 1700.20a, 1700.20b, 1700.23, 1700.24, 1700.25, 1700.26, 1700.27, 1700.28, 1700.30, 1700.31, 1700.32, 1700.33, 1700.34, 1700.35, 1700.36, 1700.37, 1700.38, 1700.39, 1700.40, 1700.41, 1700.43, and 1700.45 of, to add Section 1700.47 of, and to repeal and add Section 1700.10 of, the Labor Code, *relating to talent agencies*." (Stats. 1978, ch. 1382, p. 4575, italics added.)

[8] The Entertainment Commission articulated precisely this rationale in concluding there was no need to separately license personal managers: "It is not a person who is being licensed [under] the [Act;] rather, it is the activity of procuring employment. Whoever performs that activity is legally defined as a talent agent and [must be] licensed, as such. Therefore, the

### III. *Sanctions for Solicitation and Procurement Under the Act*

#### A. *Marathon's Procurement*

We note we are not called on to decide, and do not decide, what precisely constitutes "procurement" under the Act. The Act contains no definition, and the Labor Commissioner has struggled over time to better delineate which actions involve mere general assistance to an artist's career and which stray across the line to illicit procurement. Here, however, the Labor Commissioner concluded Marathon had engaged in various instances of procurement, the trial court concluded there was no material dispute that Marathon had done so, and Marathon has not further challenged that conclusion. We thus take it as a given that Marathon has engaged in one or more acts of procurement and that (as the parties also agree) Marathon has no talent agency license to do so.

We also take as a given, at least at this stage, that Marathon's unlicensed procurement did not include the procurement specifically of Blasi's *Strong Medicine* role. Blasi takes issue with this point, correctly pointing out that the Labor Commissioner found to the contrary, but (1) under the Act's statutorily guaranteed trial de novo procedure, the Labor Commissioner's findings carry no weight (*Buchwald v. Katz, supra*, 8 Cal.3d at p. 501), and (2) neither Blasi's separate statement of undisputed material facts nor the evidence supporting it establishes that Marathon procured the *Strong Medicine* role. Thus, for present purposes we presume Marathon did not procure that role for Blasi.

Finally, although Marathon argued below that it fell within section 1700.44, subdivision (d)'s "safe harbor" for procurement done in conjunction with a licensed talent agency, it has not preserved that argument here. Accordingly, we assume for present purposes that the safe harbor provision does not apply.

#### B. *The Applicability of the Doctrine of Severability to Manager-talent Contracts*

■ We turn to the key question in Blasi's appeal: What is the artist's remedy for a violation of the Act? In particular, when a manager has engaged in unlawful procurement, is the manager always barred from any recovery of outstanding fees from the artist or may the court or Labor Commissioner apply the doctrine of severability (Civ. Code, § 1599) to allow partial recovery of fees owed for legally provided services?

---

licensing of a personal manager—or anyone else who undertakes to procure employment for an artist—with the [Act] already in place would be a needless duplication of licensure activity." (Entertainment Com. Rep., *supra*, at pp. 20–21.)

Again, we begin with the language of the Act. On this question, it offers no assistance. The Act is silent—completely silent—on the subject of the proper remedy for illegal procurement.

██ On the other hand, the text of Civil Code section 1599 is clear. Adopted in 1872, it codifies the common law doctrine of severability of contracts: "Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest." (*Ibid.*) By its terms, it applies even—indeed, only—when the parties have contracted, in part, for something illegal. Notwithstanding any such illegality, it preserves and enforces any lawful portion of a parties' contract that feasibly may be severed.[9]

██ Under ordinary rules of interpretation, we must read Civil Code section 1599 and the Act so as to, to the extent possible, give effect to both. (See *Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2006) 40 Cal.4th 1, 15, fn. 11 [50 Cal.Rptr.3d 585, 145 P.3d 462]; *People v. Garcia* (1999) 21 Cal.4th 1, 6 [87 Cal.Rptr.2d 114, 980 P.2d 829].) The two are not in conflict. The Act defines conduct, and hence contractual arrangements, that are illegal: An unlicensed talent agency may not contract with talent to provide procurement services. (Lab. Code, §§ 1700.4, subd. (a), 1700.5.) The Act provides no remedy for its violation, but neither does it repudiate the generally applicable and long-standing rule of severability. Hence, that rule applies absent other persuasive evidence that the Legislature intended to reject the rule in disputes under the Act.

The conclusion that the rule applies is consistent with those Labor Commissioner decisions that recognize severability principles may apply to disputes under the Act. In *Almendarez v. Unico Talent Management, Inc.* (Cal.Lab.Com., Aug. 26, 1999) TAC No. 55-97, a radio personality sought a determination that his personal manager had acted as an unlicensed talent agency. The Labor Commissioner concluded the manager had engaged in unlawful procurement—indeed, that procuring employment was the manager's primary role (*id.* at pp. 2, 14)—but stopped short of voiding all agreements between the parties in their entirety. Citing and applying Civil Code section 1599, the Labor Commissioner concluded that a 1997 agreement between the parties had both a lawful purpose (repayment of personal expenses the manager had fronted for Almendarez) and an unlawful purpose (payment of commissions for unlawful procurement services) and should be partially enforced. (*Almendarez*, at pp. 18–21.) On numerous other occasions, the Labor Commissioner has severed contracts and allowed managers to

---

[9] Civil Code section 1598 codifies the companion principle for when severability is infeasible: "Where a contract has but a single object, and such object is unlawful, whether in whole or in part . . . , the entire contract is void."

retain or seek commissions based on severability principles without expressly citing Civil Code section 1599.[10]

■ Until two years ago, Court of Appeal decisions under the Act had neither accepted nor repudiated the general applicability of the severability doctrine.[11] In 2005, in *Yoo v. Robi, supra,* 126 Cal.App.4th 1089, however, the Court of Appeal considered whether to apply Civil Code section 1599 to allow a personal manager to seek commissions for lawfully provided services. It noted, correctly, that severance is not mandatory and its application in an individual case must be informed by equitable considerations. (*Yoo,* at p. 1105.) ■ Civil Code section 1599 grants courts the power, not the duty, to sever contracts in order to avoid an inequitable windfall or preserve a contractual relationship where doing so would not condone illegality. (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 123–124 [99 Cal.Rptr.2d 745, 6 P.3d 669].) The *Yoo* Court of Appeal concluded the windfall for the artist, Robi, was not so great as to warrant severance.

In *Chiba v. Greenwald* (2007) 156 Cal.App.4th 71 [67 Cal.Rptr.3d 86], the Court of Appeal also considered whether severance was available for an unlicensed manager/agent who in that case alleged she had had a *Marvin* agreement[12] with her deceased musician client/partner. Acknowledging she had acted without a license, the manager relinquished any claim to commissions, and the Court of Appeal thus was not presented with the question

---

[10] See, e.g., *Danielewski v. Agon Investment Co.* (Cal.Lab.Com., Oct. 28, 2005) TAC No. 41-03, pages 24–27 (partially enforcing agreement to the extent it involved loan repayment and invalidating it to the extent it involved payment of commissions for unlawful services); *Gittelman v. Karolat, supra,* TAC No. 24-02, pages 14–16 (where manager engaged in unlawful procurement before 1997 but not thereafter, holding agreement unenforceable through 1997, but allowing manager to seek commissions earned thereafter); *Cuomo v. Atlas/Third Rail Management, Inc.* (Cal.Lab.Com., Jan. 3, 2003) TAC No. 21-01, pages 13–14 (voiding contract only for the period of time after manager commenced acting as an unlicensed talent agency and denying disgorgement of commissions for earlier lawful services); *Anderson v. D'Avola* (Cal.Lab.Com., Feb. 24, 1995) TAC No. 63-93, pages 11–12 (where manager acted as an unlicensed talent agency in procuring role, denying right to recover commissions for that role, but preserving right to recover commissions for personal manager services in connection with later role lawfully procured by Anderson's licensed talent agency); *Bank of America Nat. Trust & Sav. Assn. v. Fleming* (Cal.Lab.Com., Jan. 14, 1982) No. 1098 ASC MP-432, page 16 (ordering return of 20 percent of compensation based on a determination respondent spent 20 percent of time acting as an unlicensed talent agency). More recent Labor Commissioner decisions appear to take a more stringent view toward the availability of severance. We address these decisions *post* at pages 995–996.

[11] The same is true of our own decisions. In *Styne v. Stevens, supra,* 26 Cal.4th at page 51, we correctly noted in dicta that "an unlicensed person's contract with an artist to provide the services of a talent agency is illegal and void." We did not address whether severance could ever apply to contracts with artists to provide personal management services.

[12] *Marvin v. Marvin* (1976) 18 Cal.3d 660 [134 Cal.Rptr. 815, 557 P.2d 106].

whether severance might apply to any management services that required no license. In light of the facts as pleaded, the Court of Appeal concluded equity did not require severance of any lawful portions of the *Marvin* agreement from the unlawful agreement to provide unlicensed talent agency services. (*Chiba*, at pp. 81–82.)

Neither *Chiba* nor *Yoo v. Robi, supra*, 126 Cal.App.4th 1089, stands for the proposition that severance is never available under the Act. In contrast, the Court of Appeal here expressly concluded, as we do, that it is available.

More generally, the conclusion that severance is available is consistent with a wide range of cases that have applied the doctrine to partially enforce contracts involving unlicensed services. Thus, for example, in *Birbrower, Montalbano, Condon & Frank v. Superior Court* (1998) 17 Cal.4th 119 [70 Cal.Rptr.2d 304, 949 P.2d 1] (*Birbrower*), a law firm licensed in New York, but not California, provided legal services in both states. The trial court and Court of Appeal invalidated the entire attorney fee agreement, but we reversed in part, explaining that under the doctrine of severability the firm might be able to recover the fees it had lawfully earned by providing services in New York, notwithstanding its unlicensed provision of services in California. (*Id.* at pp. 138–139.)[13] Likewise, in *Lindenstadt v. Staff Builders, Inc.* (1997) 55 Cal.App.4th 882 [64 Cal.Rptr.2d 484], an individual assisted a company in finding home health care businesses to acquire. The individual may have acted only as a finder with regard to some businesses, but may have crossed the line into providing broker services without a real estate broker license in other instances. The Court of Appeal explained that the provision of unlicensed services did not bar all relief; on remand, the unlicensed individual could still recover for those services that did not require a broker's license. (*Id.* at p. 894; see also *Levinson v. Boas* (1907) 150 Cal. 185, 194 [88 P. 825] [severance doctrine applies to contract with unlicensed pawnbroker]; *Broffman v. Newman* (1989) 213 Cal.App.3d 252, 261–262 [261 Cal.Rptr. 532] [unlicensed real estate broker may defend entitlement to compensation for services for which no license is required]; *Southfield v.*

---

[13] Blasi distinguishes *Birbrower* on the ground that there the basis for differentiating services for which recovery could be had from those for which it could not was jurisdictional. This is a distinction without a difference. We recognized in *Birbrower* a point equally applicable here: In the absence of an express contrary legislative determination, the equitable principles of severability may be applied to contracts where some portion of the services provided was unlicensed and hence unlawful. (*Birbrower, supra*, 17 Cal.4th at pp. 138–139; cf. *Lewis & Queen v. N. M. Ball Sons* (1957) 48 Cal.2d 141, 151 [308 P.2d 713] [Bus. & Prof. Code, § 7031 "represents a legislative determination that the importance of deterring unlicensed persons from engaging in the contracting business outweighs any harshness between the parties" and forecloses severance of those contracts to which it applies].)

*Barrett* (1970) 13 Cal.App.3d 290, 294 [91 Cal.Rptr. 514] [under equitable principles, unlicensed commission merchant entitled to partial recovery under contract].)

Blasi contends that even if severability may generally apply to disputes under the Act, we should announce a rule categorically precluding its use to recover for artist advice and counseling services. She relies on three sources in support of this rule: the legislative history, case law interpreting the Act, and decisions of the Labor Commissioner. None persuades us that the Legislature intended to foreclose the application of severability, as codified in Civil Code sections 1598 and 1599, to manager-talent contracts that involve illegal procurement, either generally or with regard to recovery specifically for personal manager services.

For legislative history, Blasi relies on a portion of the Entertainment Commission's 1985 report to the Legislature. Addressing whether criminal sanctions for violations of the Act, temporarily suspended in 1982, should be reinstated, the Entertainment Commission said: "The majority of the Commission believes that existing civil remedies, which are available by legal action in the civil courts, to anyone who has been injured by breach of the Act, are sufficient to serve the purposes of deterring violations of the Act and punishing breaches. These remedies include actions for breach of contract, fraud and misrepresentation, breach of fiduciary duty, interference with business opportunity, defamation, infliction of emotional distress, and the like. *Perhaps the most effective weapon for assuring compliance with the Act is the power of the Labor Commissioner, at a hearing on a Petition to Determine Controversy, to find that a personal manager or anyone has acted as an unlicensed talent agent and, having so found, declare any contract entered into between the parties void from the inception and order the restitution to the artist, for the period of the statute of limitations, of all fees paid by the artist and the forfeiture of all expenses advanced to the artist. If no fees have been paid, the Labor Commissioner is empowered to declare that no fees are due and owing, regardless of the services which the unlicensed talent agent may have performed on behalf of the artist.* [¶] These civil and administrative remedies for violation of the Act continue to be available and should serve adequately to assure compliance with the Act." (Entertainment Com. Rep., *supra*, at pp. 17–18.) According to Blasi, this passage demonstrates the Entertainment Commission endorsed voiding of contracts in all instances, and the Legislature necessarily embraced this view because it adopted all of the commission's proposals when it amended the Act in 1986.

We are not persuaded. The passage acknowledges what all parties recognize—that the Labor Commissioner has the "power" to void contracts,

that she is "empowered" to deny all recovery for services where the Act has been violated, and that these remedies are "available." But the *power* to so rule does not suggest a *duty* to do so in all instances. The Labor Commissioner is empowered to void contracts in their entirety, but nothing in the Entertainment Commission's description of the available remedies suggests she is obligated to do so, or that the Labor Commissioner's power is untempered by the ability to apply equitable doctrines such as severance to achieve a more measured and appropriate remedy where the facts so warrant. Thus, we need not consider at length Blasi's further contention that these two paragraphs in the Entertainment Commission Report accurately reflect the views of the Legislature as a whole. Even if so, they do not connote an intent that managers in proceedings under the Act be deprived of the opportunity even to raise severability.

Second, Blasi relies on those Court of Appeal decisions that have voided manager-talent contracts in their entirety. (E.g., *Chiba v. Greenwald, supra,* 156 Cal.App.4th 71; *Yoo v. Robi, supra,* 126 Cal.App.4th 1089; *Park v. Deftones, supra,* 71 Cal.App.4th 1465; *Waisbren v. Peppercorn Productions, Inc., supra,* 41 Cal.App.4th 246.) With the exception of *Chiba* and *Yoo,* discussed above, however, the decisions do not touch on when or whether the doctrine of severability should apply under the Act; as such, they offer no persuasive arguments in favor of reading the Act as precluding application of Civil Code section 1599.[14]

Finally, Blasi relies on a long line of Labor Commissioner decisions that have denied personal managers any right to recover commissions where they engaged in unlicensed solicitation or procurement. (See, e.g., *Cher v. Sammeth* (Cal.Lab.Com., July 17, 2000) TAC No. 17-99, pp. 12–13; *Sevano v. Artistic Productions, Inc.* (Cal.Lab.Com., Mar. 20, 1997) TAC No. 8-93, pp. 23–25.) But the fact this remedy is often, or even *almost always,* appropriate, does not support the position that it is *always* proper. The Labor Commissioner decisions cited above (see *ante,* at pp. 991–992) suggest the Labor Commissioner historically has recognized she has the authority to allow partial recovery in appropriate circumstances.

We recognize, however, that in more recent decisions, the Labor Commissioner has expressly adopted the position Blasi advocates: severance is never available to permit partial recovery of commissions for managerial services that required no talent agency license. (*Smith v. Harris* (Cal.Lab.Com., Aug. 27, 2007) TAC No. 53-05, pp. 16–17; *Cham v. Spencer/Cowings Entertainment, LLC* (Cal.Lab.Com., July 30, 2007)

---

[14] For this same reason, we see no basis for concluding the Legislature has acquiesced in an interpretation of the Act under which severability is precluded. Until 2005, the issue had never been discussed in the Courts of Appeal.

TAC No. 19-05, pp. 17–18.) The weight accorded agency adjudicatory rulings such as these varies according to the validity of their reasoning and their overall persuasive force. (*Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th at pp. 12–15.) Here, the Labor Commissioner's views rest in part on a reading of the legislative history as suggesting such a rule, in part on a reading of past Court of Appeal decisions as announcing such a rule, and perhaps in part on a policy judgment that voiding contracts in their entirety is necessary to enforce the Act effectively. With due respect, the Labor Commissioner's assessment of the legislative history and case law is mistaken; as we have explained, neither requires the rule she proposes. And any view that it would be better policy if the Act stripped the Labor Commissioner (and the superior courts in subsequent trials de novo) of the power to apply equitable doctrines such as severance would be squarely at odds with the Act's text, which contains no such limitation. Neither the Labor Commissioner nor we are authorized to engraft onto the Act such a limitation neither express nor implicit in its terms. We are thus unpersuaded and decline to follow the Labor Commissioner's interpretation.

 In sum, the Legislature has not seen fit to specify the remedy for violations of the Act. Ordinary rules of interpretation suggest Civil Code section 1599 applies fully to disputes under the Act; nothing in the Act's text, its history, or the decisions interpreting it justifies the opposite conclusion. We conclude the full voiding of the parties' contract is available, but not mandatory; likewise, severance is available, but not mandatory.

### C. *Application of the Severability Doctrine*

Finally, we turn to application of the severability doctrine to the facts of this case, insofar as those facts are established by the summary judgment record. Given the procedural posture, our inquiry is narrow: On this record, has Blasi established as a matter of law that there is no basis for severance?

 In deciding whether severance is available, we have explained "[t]he overarching inquiry is whether ' "the interests of justice . . . would be furthered" ' by severance." (*Armendariz v. Foundation Health Psychcare Services, Inc., supra,* 24 Cal.4th at p. 124.) "Courts are to look to the various purposes of the contract. If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced. If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate." (*Ibid.*; accord, *Little v. Auto Stiegler, Inc.* (2003) 29 Cal.4th 1064, 1074 [130 Cal.Rptr.2d 892, 63 P.3d 979].)

Blasi does not contend that particular evidence in the record unique to this contract establishes severance cannot apply. Instead, she offers two arguments applicable to this contract and to manager-talent contracts in general.

First, Blasi points to the nature of the compensation. In the Marathon-Blasi contract, as with most such contracts, there is no match between services and compensation. That is, a personal manager provides an undifferentiated range of services; in exchange, he receives an undifferentiated right to a certain percentage of the client's income stream.

▬ This compensation scheme is essentially analogous to a contingency fee arrangement, in which an attorney provides an undifferentiated set of services and is compensated not for each service but as a percentage of the ultimate recovery her efforts yield for her client. In *Birbrower*, we dealt with both fixed fee and contingency fee arrangements, and nothing in the nature of the latter stood as an obstacle to application of severability. We directed the trial court to determine on remand, if it determined a partially valid agreement existed, what value should be attributed to legally provided services and what to illegally provided services. (*Birbrower*, *supra*, 17 Cal.4th at pp. 139–140.) While an undifferentiated compensation scheme may in some instances preclude severance (see Civ. Code, § 1608; *Selten v. Hyon* (2007) 152 Cal.App.4th 463, 471 [60 Cal.Rptr.3d 896]), *Birbrower* demonstrates that it does not represent a categorical obstacle to application of the doctrine.[15] Accordingly, we may not affirm summary judgment on this basis.

▬ Second, Blasi argues that once a personal manager solicits or procures employment, all his services—advice, counseling, and the like— become those of an unlicensed talent agency and are thus uncompensable. We are not persuaded. In this regard, the conduct-driven definitions of the Act cut both ways. A personal manager who spends 99 percent of his time engaged in counseling a client and organizing the client's affairs is not insulated from the Act's strictures if he spends 1 percent of his time procuring or soliciting; conversely, however, the 1 percent of the time he spends soliciting and procuring does not thereby render illegal the 99 percent of the time spent in conduct that requires no license and that may involve a level of personal service and attention far beyond what a talent agency might have time to provide. Courts are empowered under the severability doctrine to consider the central purposes of a contract; if they determine in a given instance that the

---

[15] Other courts have likewise recognized that severability may apply, so long as the service provider contributes lawful consideration wholly independent of the illegal services, without regard to whether payment was allocated in advance between the lawful and unlawful services. (E.g., *Whorton v. Dillingham* (1988) 202 Cal.App.3d 447, 452–454 [248 Cal.Rptr. 405] [applying severance where the plaintiff alleged a *Marvin* agreement based on both sexual services and chauffeur, bodyguard, secretarial, and business services].)

parties intended for the representative to function as an unlicensed talent agency or that the representative engaged in substantial procurement activities that are inseparable from managerial services, they may void the entire contract. For the personal manager who truly acts as a personal manager, however, an isolated instance of procurement does not automatically bar recovery for services that could lawfully be provided without a license. (See *Lindenstadt v. Staff Builders, Inc.*, *supra*, 55 Cal.App.4th at p. 894.)

██ Inevitably, no verbal formulation can precisely capture the full contours of the range of cases in which severability properly should be applied, or rejected. The doctrine is equitable and fact specific, and its application is appropriately directed to the sound discretion of the Labor Commissioner and trial courts in the first instance. As the Legislature has not seen fit to preclude categorically this case-by-case consideration of the doctrine in disputes under the Act, we may not do so either.

In closing, we note one final point apparent from the briefing and oral argument. Letters and briefs submitted by personal managers indicate a uniform dissatisfaction with the Act's application. At oral argument, counsel for Blasi likewise agreed that the Legislature might profitably consider revisiting the Act. The Legislature has in the past expressed dissatisfaction with the Act's enforcement scheme. (See Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1359 (1989–1990 Reg. Sess.) as amended May 1, 1989, p. 2 [decrying absence of effective regulatory and enforcement mechanisms in the wake of the Entertainment Commission's inability to devise an "equitable civil or criminal penalty system"].) Adopted with the best of intentions, the Act and guild regulations aimed at protecting artists evidently have resulted in a limited pool of licensed talent agencies and, in combination with high demand for talent agency services, created the right conditions for a black market for unlicensed talent agency services. (See Assem. Labor and Employment Com., Republican Analysis of Sen. Bill No. 1359 (1989–1990 Reg. Sess.) as amended May 1, 1989 [Labor Commissioner believes unlicensed talent agencies outstrip licensed talent agencies two to one].) In the event of any abuses by unlicensed talent agencies, the principal recourse for talent is to raise unlawful procurement as a defense against collection of commissions, but this is a blunt and unwieldy instrument. It is of little use to unestablished artists, who it appears may legitimately fear blacklisting (*Talent Agencies Act*, *supra*, 28 Pepperdine L.Rev. at p. 402; *Contested Ascendancy*, *supra*, 20 Loyola L.A. Ent. L.Rev. at p. 517), and may well punish most severely those managers who work hardest and advocate most successfully for their clients, allowing the clients to establish themselves, make themselves marketable to licensed talent agencies, and be in a position to turn and renege on commissions (e.g., *Kilcher v. Vainshtein*, *supra*, TAC No. 02-99; *Contested Ascendancy*, at p. 517).

We, of course, have no authority to rewrite the regulatory scheme. In the end, whether the present state of affairs is satisfactory is for the Legislature to decide, and we leave that question to the Legislature's considered judgment.

DISPOSITION

For the foregoing reasons, we affirm the Court of Appeal's judgment and remand this case for further proceedings consistent with this opinion.

Kennard, Acting C. J., Baxter, J,. Chin, J., Moreno, J., Corrigan, J., and McAdams, J.,* concurred.

Appellant's petition for a rehearing was denied March 12, 2008, and the opinion was modified to read as printed above. George, C. J., and Moreno, J., did not participate therein.

---

*Associate Justice of the Court of Appeal, Sixth Appellate District, assigned by the Acting Chief Justice pursuant to article VI, section 6 of the California Constitution.