Filed 12/28/21  A-Mark Foundation v. Advanced Media Networks CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| A-MARK FOUNDATION, et al., <br><br> Plaintiffs, Cross-defendants and Appellants, <br><br> v. <br><br> ADVANCED MEDIA NETWORKS, LLC, <br><br> Defendant, Cross-complainant and Appellant. | B295234 <br><br> (Los Angeles County Super. Ct. No. SC118930) <br><br><br> ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on December 21, 2021, be modified as follows:

1.  On page 1, the superior court number is corrected to read SC118930.

[There is no change in the judgment.]

_____

KALRA, J.*　　　　　　　EDMON, P.J.　　　　　　EGERTON, J.

\* 　　 Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 12/21/21  A-Mark Foundation v. Advanced Media Networks CA2/3
(unmodified opinion

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| A-MARK FOUNDATION, et al.,<br><br>Plaintiffs, Cross-defendants and Appellants,<br><br>v.<br><br>ADVANCED MEDIA NETWORKS, LLC,<br><br>Defendant, Cross-complainant and Appellant. | B295234<br><br>(Los Angeles County Super. Ct. No. SC118390) |

APPEALS from a judgment of the Superior Court of Los Angeles County, Richard A. Stone and Mitchell L. Beckloff, Judges.

Hawley Troxell Ennis & Hawley, Kurtz Law and John F. Kurtz for Plaintiffs, Cross-defendants and Appellants.

Law Offices of Harold J. Light, Harold J. Light and Bruce A. Gilbert for Defendant, Cross-complainant and Appellant.

Although this matter originated with patent infringement litigation, these appeals have nothing to do with intellectual property. Rather, we are primarily tasked with interpreting Business and Professions Code section 6155, [1] which regulates lawyer referral services.

A-Mark Foundation (A-Mark) and AMAG, Inc. (AMAG) filed a breach of contract action against Advanced Media Networks, LLC (AMN) arising out of an underlying Patent Litigation Agreement (PLA). AMN, in turn, filed a cross-complaint against A-Mark, AMAG, and Steven C. Markoff (Markoff) (sometimes collectively referred to as A-Mark), alleging, inter alia, a cause of action under the Unfair Competition Law (UCL) (§ 17200 et seq.), as well as a cause of action for money had and received.

The trial court determined that the underlying contract, the PLA, violated section 6155. It therefore declared the contract unenforceable and granted summary judgment in favor of AMN on A-Mark's action for breach of contract. Thereafter, AMN proceeded on its cross-complaint. At the bench trial on the UCL claim, the trial court denied AMN's request for restitution, while granting AMN's request for injunctive relief. Then, after A-Mark unsuccessfully moved for summary adjudication on AMN's cause of action for money had and received, the jury awarded AMN $1,197,951.45 in damages on that cause of action.

---

[1] All further statutory references are to the Business and Professions Code unless otherwise indicated.

A-Mark appealed the judgment insofar as the court granted summary judgment in favor of AMN on A-Mark's complaint, and denied A-Mark's motion for summary adjudication on AMN's cross-complaint for money had and received. AMN cross-appealed, contending the award of prejudgment interest was inadequate.

With respect to the grant of summary judgment in favor of AMN on A-Mark's complaint, A-Mark contends the trial court erred (1) in its construction of section 6155 and in finding that A-Mark operated as an unlawful attorney referral service; and (2) in concluding that the unlawful attorney referral clause could not be severed from the rest of the PLA.

With respect to the denial of A-Mark's motion for summary adjudication on AMN's cross-complaint for money had and received, A-Mark contends that ruling was erroneous because: (1) the PLA is not void; (2) the trial court's decision to deny restitution at the UCL bench trial precluded the money had and received claim from going to the jury; and (3) a claim for money had and received requires a total failure of consideration, which was not the case here.

On AMN's cross-appeal, it contends the trial court abused its discretion in failing to award prejudgment interest on $288,330.28 of the damages award.

For the reasons discussed below, we conclude as follows:

First, the trial court properly granted AMN's motion for summary judgment on A-Mark's complaint for breach of contract because the PLA called for unlawful attorney referral services in violation of section 6155 and therefore was unenforceable.

Second, the portion of the PLA that called for unlawful attorney referral services cannot be severed from the balance of the agreement, making the PLA void in its entirety.

Third, because the PLA was void due to illegality, AMN was entitled to maintain a common count to recover the monies that it had paid to A-Mark pursuant to the PLA, irrespective of the trial court's exercise of its discretion to deny restitution of those monies under the UCL.

Fourth, with respect to the sole issue raised by AMN's cross-appeal, we conclude the trial court properly refused to award AMN prejudgment interest on $288,330.28 of the damages award.

Therefore, the judgment is affirmed in its entirety.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *The PLA.*

AMN owned certain patents which allegedly had been infringed. On March 24, 2008, AMN, through its chief executive officer, Richard Agostinelli, and an entity identified as Precious Metals Finance, LLC (PMF), through Markoff, its sole manager, entered into the PLA which is the subject of this dispute.[2] The PLA, a three-page document, stated that "AMN has requested that PMF become involved in the financing and management of the Patent Claims," and that the parties agreed, inter alia:

---

[2] Although PMF is named as the contracting party in the PLA, this appears to have been a drafting error and that the proper entity was PMFC, LLC. In the trial court, AMN argued the PLA was unenforceable because PMF is a nonexistent entity. We need not address this issue because it has not been raised on appeal. For purposes of this opinion we refer to the contracting entity as PMF, which is how it was identified in the PLA.

4

"1.  PMF will use reasonable efforts to engage a law firm. specializing in litigating patent infringement claims ('PLLF') to represent AMN with regard to the Patent Claims ('Patent Litigation') on a contingency fee basis agreeable to both PMF and AMN. . . .

"2.  PMF will use reasonable efforts to manage and administrate the Patent Litigation.

"3.  PMF shall meaningfully consult with the Chief Executive Officer of AMN on a periodic basis regarding the status of the Patent Litigation, including any settlement of the Patent Litigation. . . .

"4. AMN shall at all times fully cooperate with PMF and PLLF regarding the Patent Litigation.

"5.  Any settlement of the Patent Litigation shall be agreed upon by both AMN and PMF.

"6.  Subject to the right of reimbursement described in this Agreement, PMF shall be responsible for the payment of all reasonable expenses owed to expert witnesses approved by PMF . . . to support their efforts related to the prosecution of the Patent Litigation. . . .

"7.  The amount recovered from the Patent Litigation, including any settlement thereof, shall be distributed as follows:

"a.  First, unless otherwise expressly modified by any attorney fee agreement entered into between AMN and PLLF, PMF shall be reimbursed for all reasonable expenses paid by PMF in relation to the Patent Litigation.

"b.  Second, for the payment of any attorney fees, and costs, if any, to PLLF or other expenses incurred in the Patent Litigation and owed to any expert witness or other third party

retained by AMN and/or PLLF in accordance with Section 6 above to pursue the Patent Litigation.

"c. Third, the remaining balance of any recovery from the Patent Litigation shall be shared with 60% of the remaining balance being paid to AMN and 40% of the remaining balance being paid to PMF.

"8. AMN acknowledges and agrees that this Agreement shall constitute an assignment of 40% of the proceeds of any recovery from the Patent Litigation to PMF . . . ."

Markoff contacted various law firms to discuss possible representation of AMN in connection with the patent litigation. Ultimately, the firm of Ostrow Kaufman & Frankl (Ostrow) agreed to represent AMN in the patent litigation for a contingency fee of between 25 and 45 percent, depending on the stage in the litigation that the action was resolved.

Following an initial settlement of certain patent litigation known as the *Inmarsat* lawsuit, the sum of $909,621 was distributed to A-Mark in May 2012, representing 40 percent of the net settlement proceeds as provided in the PLA. AMN subsequently refused to split further settlement proceeds with A-Mark.

2. *Pleadings*.

On November 1, 2012, A-Mark and AMAG initiated this breach of contract action against AMN, seeking to recover 40 percent of any additional net proceeds received by AMN from infringement claims on the patents identified in the PLA.

AMN, in turn, filed a cross-complaint against A-Mark, AMAG and Markoff. AMN pled that the PLA was void pursuant to section 6155 because A-Mark, AMAG and Markoff were not registered with the California State Bar to provide attorney

6

referral services.[3]  The cross-complaint included causes of action for declaratory relief as well as intentional fraud and negligent misrepresentation.  The cross-complaint also pled a cause of action under the UCL that sought restitution of monies that AMN had paid to A-Mark pursuant to the PLA, as well as injunctive relief to preclude the cross-defendants from engaging in any acts constituting the provision of attorney referral services.  AMN subsequently filed a first amended cross-complaint that added a cause of action for money had and received, to recover the $909,621 that it had paid to A-Mark pursuant to the PLA.

3. *AMN obtains summary judgment on A-Mark's action for breach of contract.*

AMN moved for summary judgment on A-Mark's complaint.  AMN contended the PLA called for PMF to provide lawyer referral services, which can only be provided by persons or entities registered with the State Bar pursuant to section 6155.  AMN asserted that because Markoff, A-Mark, PMF and any other related entity were not registered with the State Bar of

---

[3]     Section 6155 states in relevant part:  "(a) An individual, partnership, corporation, association, or any other entity shall not operate for the direct or indirect purpose, in whole or in part, of referring potential clients to attorneys, and no attorney shall accept a referral of such potential clients, unless all of the following requirements are met:  [¶]  (1) The service is registered with the State Bar of California . . . .  [¶]  (2)  The combined charges to the potential client by the referral service and the attorney to whom the potential client is referred do not exceed the total cost that the client would normally pay if no referral service were involved."

California to provide lawyer referral services, the PLA was void and unenforceable.

Additionally, AMN argued that PMF's fee under the PLA violated section 6155, subdivision (a)(2), which requires that the combined charges to the client by the referral service and the attorney to whom the potential client is referred not exceed the total cost that the client would pay if no referral service were involved.

In opposition, A-Mark denied that it had operated a lawyer referral service. It argued section 6155 "simply does not apply. Indeed, the PLA is the first and only time that Markoff or any entity in which he has a controlling interest has ever entered into an agreement that contemplated assisting another party to engage an attorney. Section 6155, which on its face proscribes the operation of a business that refers clients to attorneys, does not apply to a one-time agreement, particularly when 40% of the proceeds from the Patent Litigation [were] originally assigned to PMFC."

After hearing the matter, the trial court (Judge Stone) agreed with AMN's interpretation of section 6155 and granted AMN's motion for summary judgment. The court determined that the PLA "provides for unlawful lawyer referral services in violation of section 6155, and that Plaintiffs ha[d] not raised a triable issue of material fact as to that issue." The court found that "[t]he purposes of the PLA were for PMF, Plaintiff's alleged predecessor, to provide lawyer referral services to AMN and to manage any subsequent Patent Litigation." The court also noted that the PLA provided for PMF to receive a single consideration for its services, and that the PLA lacked a severability clause. In sum, because A-Mark's complaint for breach of contract was

8

predicated on the existence of the PLA, but the PLA was illegal and unenforceable, AMN was entitled to summary judgment on the complaint.

4. *Proceedings relating to AMN's cross-complaint to recoup money that it had paid pursuant to the PLA.*

a. *Bench trial on UCL claim; trial court grants AMN injunctive relief and denies its request for restitution.*

In 2016, the trial court (Judge Beckloff) conducted a bench trial on AMN's UCL cause of action.[4] AMN contended that because the court already had determined that the PLA violated section 6155, it followed that the PLA was an unlawful and unfair business practice within the meaning of the UCL. (§ 17200 ["unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice"].) By way of relief for the UCL violation, AMN requested an order enjoining A-Mark from providing unlawful attorney referral services, as well as restitution of monies it had paid to A-Mark pursuant to the PLA. (§ 17203.)

The trial court granted injunctive relief while denying AMN's request for restitution. It found that "an injunction is appropriate [to] ensure Cross-Defendants do not further engage in providing lawyer referral services without compliance with Section 6155." It ruled, however, that "the court is not required to order restitution upon a finding of unfair competition," because the remedy of restitution is within the court's broad discretion, and in considering whether, and to what extent, restitution is appropriate, the court may be guided by equitable considerations.

---

[4] Due to Judge Stone's retirement, the action was reassigned to Judge Beckloff, effective September 22, 2015.

9

(See *Zhang v. Superior Court* (2013) 57 Cal.4th 364, 371 [equitable remedies of UCL are subject to broad discretion of trial court and UCL does not require court to order restitution whenever an unfair business practice has been shown].) The court found that AMN's arguments for restitution "at best . . . only indirectly related to the attorney referral process. None of [these] equitable considerations concern Attorney Ostrow's skills, qualifications or willingness to represent [AMN] and the referral process. [Citation.] Attorney Ostrow was certainly economically successful in his efforts on behalf of [AMN]. . . . Accordingly, [AMN's] request for restitution is denied."

The court added, "To be clear, in exercising its discretion with regard to remedies under the demonstrated UCL violation, the court expresses no opinion concerning [AMN's] tort and contract claims and Cross-Defendants' ultimate liability, if any, on the cross-complaint. [AMN] will have the opportunity to present its equitable considerations to the jury in the context of its tort and contract claims and to argue how it has been damaged."

b. *Denial of A-Mark's motion for summary adjudication on AMN's cause of action for money had and received.*

After the bench trial on the UCL claim, AMN filed a first amended complaint to add a count for money had and received. The newly added cause of action pled that the PLA is a void contract, AMN had paid A-Mark $909,621 out of the initial settlement proceeds pursuant to the PLA, and AMN had demanded return of those funds.

In 2017, A-Mark filed a motion for summary adjudication on the cross-complaint with respect to AMN's claim for money

had and received. A-Mark contended that Judge Beckloff's ruling in the bench trial that restitution was not warranted precluded the cause of action for money had and received from going to the jury. In addition, A-Mark argued that a claim for money had and received requires a total failure of consideration, which did not occur in this case.

The trial court denied A-Mark's motion for summary adjudication of the claim for money had and received. The court explained that a common count for money had and received is available where a plaintiff has paid money pursuant to a contract that is void for illegality, and because AMN's common count claim sought to recover money paid pursuant to a void contract, the claim was not precluded by the court's earlier denial of restitution on the UCL claim.

c. *Jury trial on remaining claims; jury awarded AMN damages on its cause of action for money had and received.*

Thereafter, the remaining claims which were tried to a jury, which returned a verdict in favor of AMN on its causes of action for money had and received, intentional misrepresentation and false promise. The jury awarded AMN $1,197,951.45 on its money had and received claim, and nothing for fraud. The jury further found that A-Mark was entitled to a set-off of $410,251.62 for the reasonable value of its services. Thus, the net jury award for AMN was $787,699.83.

The jury also determined that AMN was entitled to interest on its damages as of May 15, 2012.

d. *Award of prejudgment interest.*

AMN moved for prejudgment interest on the entire $1,197,951.45 in damages that the jury awarded on AMN's claim for money had and received. The trial court, however,

11

determined that AMN was only entitled to prejudgment interest on $499,369.55 of the damages that had been awarded.  The trial court reasoned as follows:

Pursuant to Civil Code section 3287, subdivision (a), only the amount AMN paid to A-Mark under the PLA—$909,621.17— was capable of being made certain by calculation as of May 15, 2012.  The additional amount of $288,330.28 (the difference between the gross award of damages and the $909,621.17) was incapable of being made certain as of a particular date, so it declined to award prejudgment interest on that portion of the jury award.  Accordingly, after subtracting A-Mark's $410,251.62 offset from the $909,621.17, the trial court concluded that AMN was entitled to prejudgment interest on $499,369.55.

On October 31, 2018, the trial court entered judgment on the verdict, awarding damages to AMN in the net amount of $786,699.83, as well as $226,877.95 in prejudgment interest.  A-Mark and AMN filed timely notices of appeal from the judgment.[5]

## CONTENTS

---

[5]     A-Mark's notice of appeal, filed by Attorney John F. Kurtz, Jr., was filed on behalf of Markoff, in addition to A-Mark and AMAG.  Further, the Civil Case Information Statements filed by A-Mark and AMN named Markoff as a party to both the appeal and the cross-appeal.  Additionally, after the matter was fully briefed, Kurtz filed a substitution of attorney form on behalf of A-Mark, AMAG, and Markoff.  Therefore, we deem the appellate briefs filed by A-Mark's counsel to have been filed on behalf of Markoff, in addition to A-Mark and AMAG.

A-Mark contends the trial court erred in granting summary judgment in favor of AMN on A-Mark's complaint for breach of contract because: PMF did not operate as an attorney referral service in violation of section 6155; even if the PLA did violate section 6155, the illegal portion of the agreement was severable; and the PLA did not violate public policy.[6] A-Mark also contends the verdict awarding damages to AMN on its claim for money had and received must be vacated because: the trial court's denial of AMN's request for restitution in the bench trial on the UCL claim entitled A-Mark to summary adjudication on AMN's cause of action for money had and received; and a claim for money had and received requires a total failure of consideration, which did not occur in this case.

On cross-appeal, AMN contends the trial court erred in refusing to award prejudgment interest on $288,330.28 of the damage award, which represents the difference between the $1,197,951.45 that the jury awarded for money had and received, and the $909,621.17 that AMN paid A-Mark pursuant to the PLA.[7]

---

[6] While the trial court opined that the PLA was contrary to public policy, the court also stated it did not need to reach the public policy issue given its resolution of the section 6155 issue. We likewise conclude the PLA violated section 6155, and therefore we do not reach A-Mark's contention that the PLA did not contravene public policy.

[7] AMN also contends the trial court abused its discretion in the bench trial on the UCL claim when it denied AMN's request for restitution of the $909,621.17 that it paid to A-Mark pursuant to the PLA. This contention is mooted by our affirmance of the

13

## DISCUSSION

1.  *The trial court properly granted AMN's motion for summary judgment on A-Mark's complaint for breach of contract because the PLA called for unlawful attorney referral services and therefore was unenforceable.*

a. *Standard of appellate review.*

We independently review the trial court's order granting a motion for summary judgment in order to determine whether triable issues of fact exist to reinstate the action. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142.) We also review de novo questions of law, including the trial court's interpretations of statutes and whether a contract is capable of severance. (*Regents of University of California v. Superior Court* (1999) 20 Cal.4th 509, 531; *United Educators of San Francisco etc. v. California Unemployment Ins. Appeals Bd.* (2020) 8 Cal.5th 805, 812; *Koenig v. Warner Unified School Dist.* (2019) 41 Cal.App.5th 43, 54.)

b. *Principles of statutory interpretation.*

The court's "fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd

---

judgment that was entered upon AMN's favorable verdict on its cause of action for money had and received.

14

consequences the Legislature did not intend.  If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.  [Citations.]" (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.)

c.  *Section 6155.*

Section 6155, the controlling statute, provides in relevant part at subdivision (a):  "An individual, partnership, corporation, association, or any other entity shall not operate for the direct or indirect purpose, in whole or in part, of referring potential clients to attorneys, and no attorney shall accept a referral of such potential clients, unless all of the following requirements are met:  [¶]  (1) The service is registered with the State Bar of California and (a) on July 1, 1988, is operated in conformity with minimum standards for a lawyer referral service established by the State Bar, or (b) upon approval by the Supreme Court of minimum standards for a lawyer referral service, is operated in conformity with those standards."

The essential issue presented is the meaning of the phrase "operate for the direct or indirect purpose, in whole or in part, of referring potential clients to attorneys." (§ 6155, subd. (a).)  Does it refer to how an individual or entity behaves on a discrete occasion, as the trial court found—or does it refer to the purpose of the enterprise's existence, its raison d'être, as A-Mark argues?  Case law interpreting this section is instructive.

(d)  *Case law interpreting section 6155.*

(1)  *The* Hyon *decision.*

*Selten v. Hyon* (2007) 152 Cal.App.4th 463, 468 (*Hyon*) appears to be the first case construing section 6155, and it is the

authority upon which the trial court primarily relied in granting summary judgment for AMN.

Selten was president of National Legal Network (NLN), which agreed to provide litigation support services, including retaining counsel for Hyon and Colangelo, in certain litigation. The agreement provided that if NLN succeeded in retaining new counsel for Hyon and Colangelo and performed the other services required by the contract, NLN would receive a 12 percent contingency fee of any recovery. (*Hyon*, *supra*, 152 Cal.App.4th at p. 465.) NLN did succeed in retaining counsel, and the litigation ultimately resulted in a settlement. (*Id.* at pp. 465-466.) Disagreements arose between the parties regarding, among other issues, distribution of the settlement proceeds. Hyon filed suit against Colangelo and Selten. Selten, as NLN's assignee, filed a cross-complaint against Hyon and Colangelo to recover under their agreement. (*Ibid.*)

Hyon moved for summary judgment on Selten's cross-complaint, arguing that all of Selten's claims were based on their 1997 contract, the contract called for Selten to engage in the unauthorized practice of law and to provide attorney referral services in violation of section 6155, pursuant to the 1997 contract Selten did in fact engage in the unauthorized practice of law and did provide unlawful attorney referral services, and the 1997 contract was therefore illegal and unenforceable. (*Hyon*, *supra*, 152 Cal.App.4th at p. 466.) In opposition, Selten argued, inter alia, that his business, NLN, did not constitute an attorney referral service within the meaning of section 6155, but Selten did not dispute Hyon's contention that neither Selten nor NLN was registered with the State Bar as an attorney referral service. (*Hyon*, at p. 467.)

16

The trial court granted Hyon's motion for summary judgment on the ground that the contract called for, and Selten did in fact provide, unlawful attorney referral services. The trial court further reasoned that the unlawful provisions of the contract could not be severed because the contract provided for a single consideration, namely, the contingent fee, in exchange for all of Selten's services, including attorney referrals. The trial court therefore concluded that the entire contract was unenforceable. The trial court further determined that because all of Selten's claims required proof of the unlawful contract and the consideration purportedly due under it, Hyon was entitled to judgment in his favor on Selten's entire first amended cross-complaint. The trial court did not reach the issue of the unauthorized practice of law. (*Hyon*, *supra*, 152 Cal.App.4th at p. 467.)

The reviewing court affirmed in part, concluding that "[t]he 1997 contract is illegal insofar as it required NLN to provide unlawful attorney referral services in order to earn the contingent fee. The illegal portions of the contract cannot be severed. We therefore agree with the trial court that the contract is illegal and unenforceable in its entirety." (*Hyon*, *supra*, 152 Cal.App.4th at p. 471.) However, *Hyon* also found that the illegality of the contract did not bar Selten's claim for the reasonable value of lawful services rendered, and therefore reversed the judgment in part to allow Selten to proceed on the common count to recover for those services. (*Ibid.*)

On the main issue, *Hyon* held that "[b]ecause the contract called for NLN to 'operate for the direct or indirect purpose, in whole or in part, of referring potential clients to attorneys,' it violated section 6155." (*Hyon*, *supra*, 152 Cal.App.4th at p. 468.)

17

*Hyon* addressed and rejected Selten's multiple arguments to the contrary, stating as follows:

"First, he argues that the overall purpose of the 1997 contract was for NLN to provide litigation support services, not merely to refer Hyon and Colangelo to attorneys, and that attorney referrals were a '[r]elatively [m]inor' part of the contract. In a similar vein, Selten argues that his duties did not end, but rather began, with the referral to counsel, that he was obligated to continue to provide other services throughout the course of the litigation, and that he would be paid nothing if the litigation were not resolved in favor of Hyon and Colangelo. The argument fails because it does not matter that the contract required NLN to provide other services, that those other services were purportedly the main purpose of the agreement, or that NLN's compensation was contingent upon a favorable outcome in the litigation. (*Keene v. Harling* (1964) 61 Cal.2d 318, 319–320 [if part of the consideration violates a statute, then the contract is partially illegal].) Notwithstanding those provisions, the contract required NLN to refer Hyon and Colangelo to attorneys for a fee, in violation of section 6155. Therefore, the contract was at least partially illegal.

"Second, Selten argues that under Evidence Code section 951, an 'authorized representative' can retain a lawyer on behalf of a client, so NLN's retention of counsel on behalf of Hyon and Colangelo cannot have been unlawful. We disagree. Evidence Code section 951 defines the term 'client' solely for purposes of the attorney-client privilege. (*Moeller v. Superior Court* (1997) 16 Cal.4th 1124, 1129.) By including 'authorized representative' in the definition of 'client,' the statute extends the privilege to cover not only communications directly between the client and the

18

attorney but also communications between the client's agents and the attorney. (*Ibid.*) Nothing in the statute suggests, however, that an unregistered individual or entity may charge a fee for referring potential clients to attorneys without violating section 6155.

"Third, Selten argues that the contract did not actually require NLN to refer Hyon and Colangelo to attorneys, because nothing in the contract prohibited Hyon and Colangelo from finding attorneys on their own. The argument fails because the contract expressly denied NLN any right to compensation '[i]n the event NLN is unsuccessful in arranging [a]ttorney(s) to come into this [l]awsuit in [c]lients' behalf[.]' Thus, by its terms, the contract required NLN to find attorneys for Hyon and Colangelo.

"Fourth, Selten argues that he did not refer Hyon and Colangelo to Shopoff, the lawyer who ultimately settled the Decker Island litigation. Rather, Disner referred Hyon and Colangelo to Bien, who referred them to Shopoff. Thus, according to Selten, '[t]here was no nexus between any claimed referral and the ultimate successful outcome of [the underlying litigation].' The argument fails, because the presence or absence of any such 'nexus' is irrelevant. Selten does not dispute that NLN referred Hyon and Colangelo to Disner and arranged for Disner to represent them in the [underlying] litigation. Had NLN not done so, NLN would not be entitled to any compensation under the 1997 contract. NLN thus referred Hyon and Colangelo to Disner for a fee, in violation of section 6155. It does not matter that Disner withdrew before the litigation concluded, or that the final settlement of the litigation was negotiated by Shopoff. The statute provides that no individual or entity may 'operate for the direct or indirect purpose, in whole or in part, of referring

19

potential clients to attorneys.' (§ 6155.) The statute thus prohibits referral to any attorney, not just referral to an attorney who goes on to win the case.

"Fifth, Selten argues that the principal evil that motivated enactment of section 6155 was the existence of sham referral services, consisting of attorneys who would refer clients to each other (or sometimes a single attorney who would 'refer' all clients to himself or herself), and the record contains no evidence that Selten's business ever fit that model. In support of this argument, Selten relies upon certain materials from the legislative history of section 6155. The argument fails because the cited materials relate only to the 1987 enactment of the original version of section 6155. The Legislature amended the statute in 1992 to include the language we quoted *ante*, to the effect that no individual or entity shall 'operate for the direct or indirect purpose, in whole or in part, of referring potential clients to attorneys' without meeting the requirements of the statute. Thus, even if we found the statutory language sufficiently ambiguous to require resort to legislative history—which we do not—the materials cited by Selten would have no effect on our decision, because they relate to a version of the statute that did not include the language on which we rely. (*Regency Outdoor Advertising, Inc. v. City of Los Angeles* (2006) 39 Cal.4th 507, 524 [resort to legislative history is unnecessary if statutory language is unambiguous].)

"Sixth, Selten argues that he exercised due diligence in investigating whether his business constituted an unlawful attorney referral service, and that he reasonably concluded, on the basis of advice from both the State Bar and privately retained counsel, that his business did not violate section 6155. Selten's

20

good faith and diligence cannot alter the fact that the 1997 contract did require NLN to provide attorney referral services. Moreover, the State Bar and private counsel opinions predate, and do not specifically relate to, the 1997 contract; one of them actually predates the 1992 amendment of section 6155. Selten cites no evidence that anyone ever advised him that the 1997 contract did not require NLN to provide attorney referral services in violation of section 6155.

"Seventh, Selten argues that any interpretation of section 6155 that would render the 1997 contract illegal would also render the statute itself unconstitutionally vague, because it would make unlawful 'virtually every relationship in a commercial setting where a third party has involvement with another's attorney-client relationship.' Selten notes, for example, that '[a] large and disparate variety of professionals such as attorneys, accountants, personal and business managers, brokers and others, regularly help their clients find attorneys (or other professionals), often while they continue providing service to the same client for a fee.' The argument fails because NLN (and Selten, by assignment) earned its fee, in part, by referring Hyon and Colangelo to Disner. Section 6155 prohibits such conduct by an unregistered individual or entity. Our interpretation of the statute does not render it unconstitutionally vague or make illegal the commonplace uncompensated attorney referrals that Selten describes.

"Finally, Selten argues that even if the contract is partially illegal because it required NLN to provide unlawful attorney referral services, the illegal portion of the contract should be severed. But Selten never addresses the trial court's reasoning, based on Civil Code section 1608, that severance here is

impossible because the contract provides for a single consideration in exchange for all of Selten's services, including attorney referral.  Section 1608 provides that '[i]f any part of single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void.'  Attorney referrals were among the several considerations that Selten provided for a single object, namely, his contingent fee.  By statute, the contract is therefore void in its entirety." (*Hyon*, *supra*, 152 Cal.App.4th at pp. 468-471, italics omitted.)

(2)  *The decision in* Jackson v. LegalMatch.com *explaining referral activity within the meaning of section 6155*.

After this matter was ruled on below, section 6155 was construed in another decision, *Jackson v. LegalMatch.com* (2019) 42 Cal.App.5th 760 (*Jackson*).

LegalMatch.com was an online service company that connected individuals seeking legal assistance to lawyers who had purchased a LegalMatch subscription.  LegalMatch sued Jackson, a subscribing attorney, when he allegedly failed to pay for his subscription.  Jackson cross-claimed on the basis that LegalMatch was operating an uncertified lawyer referral service in violation of section 6155, rendering the subscription contract illegal and unenforceable.  The lower court rejected Jackson's argument, finding that LegalMatch was not engaged in referral activity within the meaning of section 6155.  The reviewing court reversed, concluding that Legal Match did engage in referral activity. (*Jackson*, *supra*, 42 Cal.App.5th at p. 764.)

*Jackson* explained, "a referral occurs when an entity engages in the act of directing or sending a potential client to an attorney.  The act of referring is complete when LegalMatch

routes a potential client to attorneys who match the geographic location and area of practice—regardless of whether LegalMatch exercises legal judgment on an individual's issue before communicating that information to lawyers on its panel." (*Jackson*, *supra*, 42 Cal.App.5th at p. 777, fn. omitted.) Accordingly, when "LegalMatch gathers potential clients' geographic and case-type information and sends those potential clients to attorneys who (a) match the location and (b) have been permitted to join LegalMatch within a relevant practice area, the act of referral is complete.  Section 6155 requires no more for a service to fall within its ambit." (*Jackson*, at p. 778.)

   e.  *The trial court properly granted AMN's motion for summary judgment because the PLA violated section 6155; A-Mark's attempts to distinguish the* Hyon *decision are unavailing*.

  In *Hyon*, as indicated, the contract called for NLN to retain counsel to represent Hyon and Colangelo, and provided that NLN would be entitled to compensation if it were to recruit counsel for Hyon and Colangelo and to perform the other services called for under the contract.  (*Hyon*, *supra*, 152 Cal.App.4th at p. 468.) The *Hyon* court concluded it "follow[ed] as a matter of law that, under the contract, Hyon and Colangelo were paying NLN, in part, to refer them to an attorney." (*Ibid*.)  Because the contract "called for NLN to 'operate for the direct or indirect purpose, in whole or in part, of referring potential clients to attorneys,' it violated section 6155." (*Ibid*.)  Thus, *Hyon* scrutinized the contract's objective in finding a violation of section 6155.

  Similarly, in the instant case, the PLA called for PMF to engage a law firm to represent AMN in the patent litigation, as well as to finance, manage, and administer the patent litigation, and that if successful, PMF would recover 40 percent of the

proceeds of any recovery from the patent litigation, after payment of PMF's reasonable expenses as well as attorney fees and costs. Thus, under the PLA, AMN would be paying PMF, "in part, to refer [AMN] to an attorney. (*Hyon, supra*, 152 Cal.App.4th at p. 468.) Because the PLA "called for [PMF] to 'operate for the direct or indirect purpose, in whole or in part, of referring potential clients to attorneys,' it violated section 6155." (*Ibid.*)

A-Mark's various arguments to the contrary are unpersuasive.

A-Mark contends section 6155 does not apply because the PLA was PMF's "only foray into lawyer finding," and that in enacting section 6155, the Legislature only intended the statute "to apply to entities that connect lawyers to clients on a *repeated* basis, and [where] the enterprise's *principal* income comes from brokering such connections." (Italics added.) Stated another way, A-Mark would construe the statute as applying solely to an individual or entity that operates "for the *primary* ~~direct or indirect~~ purpose, ~~in whole or in part,~~ of referring potential clients to attorneys on *a repeated basis and whose principal income comes from brokering such connections*." However, these implied limitations lack support in the plain text of section 6155.[8] To the contrary, the statute is written expansively to prohibit any individual or entity from "operat[ing] for the *direct or indirect*

---

[8]    Moreover, the construction proposed by A-Mark would lead to a rule that is nebulous and unworkable. How many referrals must occur before an entity's primary purpose is to operate as a lawyer referral service? Two, ten, one hundred? Similarly, what percentage of the enterprise's income must be based upon lawyer referrals to constitute a principal source of the enterprise's income?

*purpose, in whole or in part*, of referring potential clients to attorneys," unless the statutory requirements are satisfied. (§ 6155, subd. (a), italics added.) Further, in *Hyon*, the contract was held illegal in part and unenforceable, although there was no indication in that opinion that NLN, the entity that provided the attorney referral service, had connected lawyers to clients on a repeated basis. (*Hyon, supra*, 152 Cal.App.4th at pp. 465-467.)[9]

A-Mark also contends that finding a lawyer was only a "collateral purpose, one among many" obligations of the PLA. Again, *Hyon* is dispositive. In rejecting this argument, *Hyon* stated "it does not matter that the contract required NLN to provide other services [or] that those other services were purportedly the main purpose of the agreement." (*Hyon, supra*,152 Cal.App.4th at p. 469.) Therefore, A-Mark's attempt to characterize PMF's obligation under the PLA to engage counsel for AMN as a collateral purpose of the PLA does not advance A-Mark's argument.

A-Mark also argues that section 6155 does not apply because PMF was not even obligated by the PLA to find a lawyer for AMN; rather, the PLA merely required FM to "use reasonable

---

[9] We note that A-Mark's opening brief improperly cited the lower court's unpublished order in *Hyon* for the proposition that during the time NLN was in business, it had over a thousand clients and had obtained hundreds of attorneys for its clients. However, there is no mention in the published appellate decision in *Hyon* of a history of attorney referrals by NLN. Thus, *Hyon*'s holding that the contract violated section 6155 was not based on the fact that NLN repeatedly referred clients to attorneys. Therefore, we do not read *Hyon* as applying only when an entity repeatedly refers clients to attorneys.

efforts to engage a law firm." The argument is unpersuasive because, similarly to *Hyon*, the PLA called for PMF to obtain counsel for AMN in order to earn its 40 percent contingent fee. (*Hyon, supra*, 152 Cal.App.4th at p. 471.) Had patent litigation counsel not been secured, there would have been no patent infringement litigation, no recovery by AMN, and no contingent fee would have been payable under the PLA. Therefore, the PLA's provision that PMF use "reasonable efforts" to secure counsel did not take the PLA outside the ambit of section 6155. [10]

A-Mark further contends that rather than a "referral," what occurred here "was actually a 'self-referral' or, more accurately, no referral at all." A-Mark argues that in reality, Markoff simply agreed to help find a lawyer for a joint venture between AMN and PMF to monetize the patents, and because Markoff merely was finding a lawyer for his own benefit, there was no referral and section 6155 is not implicated. A-Mark cites no authority for this novel "self-referral" theory. Moreover, this attempt to recharacterize the relationship between the parties as a joint venture is belied by the language of the PLA, to which AMN and PMF were parties, and which assigned to PMF the role of securing counsel as well as managing and financing the patent litigation.

---

[10] A-Mark also denies that Markoff made a referral because Ostrow, the counsel that was ultimately retained, had been initially identified by Agostinelli. This argument lacks merit. The fact remains that the PLA called for PMF to find a lawyer for patent litigation, and Markoff was actively involved in Ostrow's retention, including negotiating the terms of the retention.

In sum, we conclude the PLA is illegal insofar as it required PMF to provide attorney referral services to AMN in violation of section 6155.

   f. *The illegal portion of the contract cannot be severed.*

A-Mark contends that even if the PLA violates section 6155, the portion requiring PMF to provide attorney referral services should be severed, leaving the balance of the PLA enforceable.

*Hyon* is on point. It concluded the illegal portion of the contract requiring NLN to provide unlawful attorney referral services could not be severed, and therefore the contract was unenforceable in its entirety. (*Hyon, supra*, 152 Cal.App.4th at p. 471.) *Hyon* explained: "Selten argues that even if the contract is partially illegal because it required NLN to provide unlawful attorney referral services, the illegal portion of the contract should be severed. But Selten never addresses the trial court's reasoning, based on Civil Code section 1608, that severance here is impossible because the contract provides for a single consideration in exchange for all of Selten's services, including attorney referral. [Civil Code] [s]ection 1608 provides that '[i]f any part of single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void.' Attorney referrals were among the several considerations that Selten provided for a single object, namely, his contingent fee. By statute, the contract is therefore void in its entirety. . . . [W]e conclude that the illegal portions of the contract cannot be severed—the entire contract is void." (*Hyon, supra*, 152 Cal.App.4th at p. 471.)

Notwithstanding this clear holding in *Hyon*, A-Mark contends severance is mandated by the Supreme Court's decision in *Marathon Entertainment, Inc. v. Blasi* (2008) 42 Cal.4th 974 (*Marathon*).) A-Mark's reliance on *Marathon* is misplaced.

*Marathon* addressed the legal consequences that arise when a personal manager solicits or procures employment for a client without a talent agency license. (*Marathon*, *supra*, 42 Cal.4th at p. 980.) *Marathon* held that the strictures of the Talent Agencies Act (Lab. Code, § 1700 et seq.) apply to personal managers as well as agents, and while the Labor Commissioner has the authority to void manager-talent contracts *ab initio* for unlawful procurement, she also has discretion to apply the doctrine of severability to partially enforce these contracts. (*Marathon*, at pp. 980-981.)

With respect to severability, *Marathon* explained "a personal manager provides an undifferentiated range of services; in exchange, he receives an undifferentiated right to a certain percentage of the client's income stream. [¶] This compensation scheme is essentially analogous to a contingency fee arrangement, in which an attorney provides an undifferentiated set of services and is compensated not for each service but as a percentage of the ultimate recovery her efforts yield for her client. In *Birbrower*,[11] we dealt with both fixed fee and

---

[11] In *Birbrower, Montalbano, Condon & Frank v. Superior Court* (1998) 17 Cal.4th 119, "a law firm licensed in New York, but not California, provided legal services in both states. The trial court and Court of Appeal invalidated the entire attorney fee agreement, but [the Supreme Court] reversed in part, explaining that under the doctrine of severability the firm might be able to

contingency fee arrangements, and nothing in the nature of the latter stood as an obstacle to application of severability. We directed the trial court to determine on remand, if it determined a partially valid agreement existed, what value should be attributed to legally provided services and what to illegally provided services. (*Birbrower*, *supra*, 17 Cal.4th at pp. 139–140.) *While an undifferentiated compensation scheme may in some instances preclude severance* (see Civ. Code, § 1608; *Selten v. Hyon* (2007) 152 Cal.App.4th 463, 471), *Birbrower* demonstrates that it does not represent a categorical obstacle to application of the doctrine." (*Marathon*, *supra*, 42 Cal.4th at p. 997, italics added.)

Thus, while *Marathon* allowed for severability of contracts that violate the Talent Agencies Act (Lab. Code, § 1700 et seq.), and also held that an undifferentiated compensation scheme does not necessarily preclude severance, it simultaneously cited with approval the *Hyon* decision, which held that a lawyer referral agreement that violated section 6155 and that provided for undifferentiated compensation was not severable.

Thus, consistent with *Hyon,* we conclude the portion of the PLA that called for PMF to provide unlawful attorney referral services cannot be severed from the balance of the agreement, making the PLA void in its entirety. (*Hyon, supra,* 152 Cal.App.4th at p. 471.)

---

recover the fees it had lawfully earned by providing services in New York, notwithstanding its unlicensed provision of services in California. (*Id.* at pp. 138–139.)" (*Marathon*, *supra*, 42 Cal.4th at p. 993.)

Accordingly, the trial court properly granted summary judgment in favor of AMN on A-Mark's complaint for breach of contract.

2. *The trial court did not err in denying A-Mark's motion for summary adjudication on AMN's cause of action for money had and received.*

a. *Overview.*

As indicated, in the UCL bench trial, the trial court granted AMN's request for injunctive relief but denied its request for restitution of the $909,621.17 that AMN had paid to A-Mark pursuant to the PLA. The trial court noted that it is not required to order restitution upon a finding of unfair competition, its decision is guided by equitable considerations (*Zhang v. Superior Court*, *supra*, 57 Cal.4th at p. 371), and after considering the matter, the court determined that "restitution is not warranted in this case."

AMN subsequently filed a first amended cross-complaint that added a new cause of action for money had and received. The amended pleading alleged that A-Mark was indebted to AMN for the $909,621.17 that AMN had paid to A-Mark pursuant to the PLA.

A-Mark moved for summary adjudication on the cause of action for money had and received on the ground that Judge Beckloff's equitable ruling in the bench trial that restitution was not warranted precluded the jury from awarding restitution of the $909,621.17 by way of a cause of action for money had and received. In addition, A-Mark argued that a claim for money had and received requires a total failure of consideration, which did not occur in this case.

The trial court denied A-Mark's motion for summary adjudication of the claim for money had and received. The court explained that a common count for money had and received is available where a plaintiff has paid money pursuant to a contract that is void for illegality, and because AMN's common count claim sought to recover money paid pursuant to a void contract, the claim was not precluded by the court's earlier denial of restitution on the UCL claim.

On appeal, [12] A-Mark contends the trial court erred in denying its motion for summary adjudication of the claim for money had and received, and that the verdict awarding damages to AMN for money had and received must be vacated because (1) the PLA is not void, [13] (2) the decision in the UCL bench trial denying restitution precluded the claim for money had and received from going to the jury, and (3) a claim for money had and received requires a total failure of consideration, which did not occur here. As explained, we find no error.

---

[12] An order denying a motion for summary adjudication is a nonappealable order that may be reviewed on direct appeal from a final judgment entered after a trial. (*Federal Deposit Ins. Corp. v. Dintino* (2008) 167 Cal.App.4th 333, 343.) In reviewing that order, we apply the same standards as we would in reviewing a trial court's order granting or denying a motion for summary judgment. (*Id.* at p. 344.)

[13] We have already determined the PLA was void in its entirety, so this argument necessarily fails.

b. *Trial court properly denied A-Mark's motion for summary adjudication of AMN's cause of action for money had and received; denial of claim for restitution under the UCL did not preclude AMN from pursuing a common count for money had and received.*

A-Mark's theory is that because the trial court in the UCL bench trial determined that A-Mark did not owe restitution of the money it received from AMN pursuant to the PLA, the contrary jury finding in favor of AMN on its common count for money had and received cannot be reconciled, and the claim for money had and received should have been eliminated on summary adjudication.

The argument is meritless because the elements of a claim for restitution under the UCL, and a common count for money had and received, are different.

As stated in *Zhang*, "the equitable remedies of the UCL are subject to the broad discretion of the trial court. [Citation.] The UCL does not *require* 'restitutionary or injunctive relief when an unfair business practice has been shown. Rather, it provides that the court "*may* make such orders or judgments . . . as may be necessary to prevent the use or employment . . . of any practice which constitutes unfair competition . . . or as may be necessary to restore . . . money or property."' [Citation.] '[I]n addition to those defenses which might be asserted to a charge of violation of the statute that underlies a UCL action, a UCL defendant may assert equitable considerations. In deciding whether to grant the remedy or remedies sought by a UCL plaintiff . . . consideration of the equities between the parties is necessary to ensure an equitable result.' [Citation.]" (*Zhang v. Superior Court*, *supra*, 57 Cal.4th at p. 371, original italics.)

32

On the other hand, a cause of action is stated "for money had and received if the defendant is indebted to the plaintiff in a certain sum 'for money had and received by the defendant for the use of the plaintiff.' [Citations.] *The cause of action is available where . . . the plaintiff has paid money to the defendant pursuant to a contract which is void for illegality*. [Citation.]" (*Schultz v. Harney* (1994) 27 Cal.App.4th 1611, 1623, italics added.)

Because the PLA was void due to illegality, AMN was entitled to maintain a common count to recover the $909,621.17 that it had paid to A-Mark pursuant to the PLA, irrespective of the trial court's exercise of its discretion to deny restitution of those monies under the UCL.

b.  *A common count for money had and received does not require a total failure of consideration.*

A-Mark contends that a claim for money had and received requires a total failure of consideration, which did not occur here. The argument is meritless.

*Brown v. Grimes* (2011) 192 Cal.App.4th 265 (*Brown*), on which A-Mark primarily relies, actually states:  "A party is entitled to restitution when the contract has failed, *such as when it is void*, or has been rescinded or '*the consideration has wholly failed*.' (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 1042, pp. 1132–1133.)" (*Brown, supra*, 192 Cal.App.4th at p. 281, first italics added.)  Because the PLA was void, AMN was entitled to seek recovery of the monies it paid pursuant to the PLA, irrespective of whether there was a total failure of consideration.

In sum, A-Mark has not shown any error in the trial court's refusal to grant summary adjudication on AMN's common count for money had and received.

3. *AMN's cross-appeal; no showing of error in the trial court's refusal to award prejudgment interest on $288,330.28 of the award.*

    a. *Overview.*

The jury awarded AMN damages of $1,197,951.45 on its claim for money had and received.[14]  The jury further found that AMN was entitled to interest on its damages from and after May 15, 2012, the day AMN paid A-Mark $909,621.17 in settlement proceeds pursuant to the PLA.  The jury also determined that AMN owed $410,251.62 to AMAG for the reasonable value of services rendered.

In its post-trial motion, AMN asked the trial court to award prejudgment interest on the entire $1,197,951.45 pursuant to Civil Code section 3287, subdivision (a).[15]  AMN argued that "[b]eyond any doubt, [its] money had and received cause of action constituted a liquidated claim" based in contract.  As a fallback

---

[14]    Apart from restoring to AMN the $909,621.17 that AMN had paid to A-Mark on May 15, 2012, pursuant to the PLA, the jury awarded AMN an additional $288,330.28 on its claim for money had and received.  According to AMN, $215,134.83 of that sum was based on trial testimony that Markoff had increased Ostrow's contingency fee interest to avoid PMF's obligation to advance costs.  AMN conceded it was unclear "how the jury came up with the remaining $73,195.45 out of the $1,197,951.45 in damages."

[15]    Civil Code section 3287 states in relevant part at subdivision (a):  "A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day[.]"

position, AMN asserted that if the trial court found that any portion of the amount over $909,621.17 was not certain or capable of being made certain by calculation, it should award AMN prejudgment interest either pursuant to Civil Code section 3287, subdivision (b),[16] or Civil Code section 3288.[17]

The trial court, relying on Civil Code section 3287, subdivision (a), reasoned that only the amount AMN paid to A-Mark under the PLA—$909,621.17— was capable of being made certain by calculation as of May 15, 2012. The trial court ruled the remaining amount of $288,330.28 was incapable of being made certain as of a specific date, so it declined to award any prejudgment interest on that segment of the jury's award. Accordingly, after subtracting A-Mark's $410,251.62 offset that was awarded by the jury, the trial court concluded that AMN was entitled to prejudgment interest on $499,369.55. The trial court calculated the amount of prejudgment interest at $226,877.95, which it added to the judgment.

b. *No merit to AMN's argument that it was entitled to prejudgment interest on an additional $288,330.28 of the award pursuant to Civil Code section 3288.*

---

[16] Civil Code section 3287 states at subdivision (b): "Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed."

[17] Civil Code section 3288 states: "In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury."

AMN's sole argument on cross-appeal is that the trial court erred in denying prejudgment interest on $288,330.28 of the damage award, which represents the difference between the total damage award and the portion of the award attributable to the amount that AMN had paid to A-Mark pursuant to the PLA. AMN contends that Civil Code section 3288 is controlling, and therefore the judgment must be modified to increase the amount of prejudgment interest.

The contention is meritless because Civil Code section 3288 is inapplicable. In *Greater Westchester Homeowners Assn. v. City of Los Angeles* (1979) 26 Cal.3d 86, at page 102, the Supreme Court explained: "Section 3288 recites, 'In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury.' We have recently affirmed that, unlike Civil Code section 3287, which relates to liquidated and contractual claims, section 3288 permits discretionary prejudgment interest for *unliquidated tort claims*. (*Bullis v. Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 814-815.)" (Italics added.)

Here, the jury did not award any damages to AMN on its tort claims. The entire $1,197,951.45 in damages was awarded in connection with AMN's claim for money had and received. "[A]n action for money had and received is *ex contractu* in nature, being founded upon a promise implied in law." (*Haigler v. Donnelly* (1941) 18 Cal.2d 674, 680.) Thus, because a claim for money had and received does not sound in tort, Civil Code section 3288 is inapplicable.

## DISPOSITION

The judgment is affirmed.  The parties shall bear their respective costs on appeal.

**NOT TO BE PUBLISHED**


KALRA, J.[*]

We concur:


EDMON, P. J.


EGERTON, J.

---

[*]    Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.